[Civ. No. 13958. Third Dist. June 15, 1973.]

SAMUEL D. SOMERS, Petitioner, v.
THE SUPERIOR COURT OF SACRAMENTO COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

**COUNSEL**

Rodney A. Klein and Lloyd H. Riley for Petitioner.

Carroll, Burdick & McDonough, Christopher D. Burdick, Belli, Ashe, Ellison & Choulos, Melvin M. Belli and James M. Garlock as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, Doris H. Maier, Assistant Attorney General, Arnold O. Overoye and Jeffrey A. Joseph, Deputy Attorneys General, for Real Party in Interest.

**OPINION**

**THE COURT.**—The Sacramento County Grand Jury returned an indictment charging Samuel D. Somers with involuntary manslaughter. (Pen. Code, § 192.) His motion to set aside the indictment under Penal Code section 995 was denied. Invoking Penal Code section 999a, he seeks a writ of prohibition, charging that the evidence before the grand jury did not supply reasonable or probable cause for his indictment.

■ Probable cause for an indictment is shown if a person of ordinary caution or prudence would be led to believe and conscientiously entertain a strong suspicion of the guilt of the accused; an indictment will not be set aside if there is some rational ground for assuming the probability that an offense has been committed and the accused is guilty of it; if there is some evidence to support the indictment, the courts will not inquire into its sufficiency (*Jackson* v. *Superior Court,* 62 Cal.2d 521 [42 Cal.Rptr. 838, 399 P.2d 374].) ■ An indictment will be set aside if there is a total absence of evidence to support a necessary element of the crime charged. (*Greenberg* v. *Superior Court,* 19 Cal.2d 319, 322 [121 P.2d 713]; *Roads* v. *Superior Court,* 275 Cal.App.2d 593, 597 [80 Cal.Rptr. 169].)

Somers was a Sacramento police sergeant. For several weeks preceding December 3, 1972, bars and markets in the business section of North Sacramento had been plagued by eight armed robberies, all bearing similarities. The robbers were described as young Negroes, rather slim and wearing medium-Afro hair styles. They appeared in groups of two to four, armed with sawed-off shotguns and handguns. In the course of the holdups the robbers had wantonly shot two women.

Sergeant Somers was in charge of a crime suppression team which had the mission of halting the holdup gang's activities. Owners of bars and other business establishments in the area were warned by the police and given telephone numbers to call in the event of suspicious activity. Policemen on the team wore casual civilian clothes and drove unmarked cars. Because of rumors or reports reaching them they were particularly alert for a possible holdup on Sunday evening, December 3. On that evening the crime suppression team consisted of Sergeant Somers, driving alone, and two pairs of officers in unmarked cars. At the time of the incident in question the night was fairly dark; a mist or light rain was falling and it was cold and windy.

Included in the affected neighborhood was a triangular block on the westerly side of Del Paso Boulevard, the principal business street of North Sacramento. Extending southward from the intersection of Del Paso Boulevard and Arden Way, the block had the appearance of a right-angle triangle facing eastward. Del Paso Boulevard formed its vertical side, Edgewater Road its base and Arden Way its hypotenuse. At the apex of the triangle, facing Del Paso Boulevard, was a cleaning establishment. Immediately south of the cleaner's shop was a vacant lot used as a passageway and sometimes called an alley. Immediately south of the alley was the Green Olive bar. Across the street on Del Paso Boulevard were bars called The Den and The Argonaut, also the Iceland Skating Rink. By charting the gang's previous targets, the officers believed that this block would be the locale of the next holdup.

Shortly after 6 p.m. Somers received a radio report that three Negroes had entered a bar in the general area, had looked it over, then departed in a black Ford. He located the vehicle, which was parked in an alley, checked the registration via radio, watched it for a while, then concluded that it furnished no ground for suspicion. At 6:42 p.m. he received another radio report, this one stating that three male Negroes were acting suspiciously on Del Paso Boulevard near the Green Olive and across the street from The Den. He was directed to have one of his crime suppression units check them out.

The second radio report received by Somers resulted in the following circumstances: A man on Del Paso Boulevard had seen three Negro youths in front of The Den, one of them carrying what appeared to be a pool stick. The man entered the Green Olive Bar and told the bartender what he had seen. The bartender locked the door and phoned the bartender at The Den across the street, who also locked his front door. Each then phoned the police. These calls formed the basis for the second message broadcast to Sergeant Somers.

At Somers' request one of the crime suppression units (Officers La-Chappelle and Brewer in an unmarked car) cruised the area, while a marked patrol car parked two blocks away as a "backup." LaChappelle and Brewer stopped at the Green Olive and saw nothing unusual. They met Sergeant Somers a block away, held a brief conversation, then parted. LaChappelle and Brewer then parked on Arden Way, not far from the cleaning establishment. Somers on foot decided to check the Argonaut bar, where he found conditions normal. He reentered his car and turned on the windshield wipers, for a light rain was falling. He then saw three young Negroes on the sidewalk across the street near the Green Olive bar. He had the impression that they had just come out of the bar. (The door to the Green Olive is in an alcove approximately four feet wide and two to three feet deep.) The three individuals matched the description of the three suspects who had been the subject of the first radio report. Additionally, Somers received the impression that they were moving furtively. He saw that two of them were holding objects. From the manner in which they were moving it appeared to him that they were holding shotguns up under their coats and along the sides of their legs. They were not talking but appeared to Somers to be walking in a hurried manner.

According to his later testimony, Somers believed the three Negroes had just robbed the Green Olive bar. He picked up his microphone and transmitted a message declaring in part: "I've got three male Negroes with shotguns. They're behind the cleaners here at the market. They just came out of the Green Olive. [Pause] . . . Cover, Code 3, they're going towards the tracks [on Arden Way] . . . ."

"Code 3" was an indication of emergency or serious trouble. Somers drove across Del Paso Boulevard and parked at the corner of Arden Way. He could see down both streets, Arden Way and Del Paso Boulevard. He saw the group emerge from the alley onto Arden Way next to the cleaning establishment. According to his testimony, the three suspects looked directly at him, froze momentarily, then bolted and ran back through the alley toward Del Paso Boulevard. Somers was exiting from his car when he heard a shotgun "rack." The term "rack" refers to the clattering sound when a shotgun shell is shoved into the weapon's chamber. According to his later testimony, he believed that one of the three suspects had loaded a shotgun, for at this point of time he did not know that any of his fellow officers were in the immediate vicinity. He left his vehicle, drew his revolver, yelled, "Halt, police" several times and ran to the front of the cleaners on Del Paso Boulevard.

When LaChappelle and Brewer heard Somers' radio broadcast that three

male Negroes with shotguns were leaving the Green Olive, they both left their car, carrying shotguns. They saw the three young Negroes emerge on Arden Way from the alley, walking in a hurry. One of the youths was carrying something long. The boys saw the officers about the same time the officers saw them. The officers racked their shotguns and Officer Brewer called out, "Stop, police officers." The three boys ran back toward Del Paso Boulevard. The officers pursued them. The boys fled southward on Del Paso Boulevard. LaChappelle saw Somers firing three revolver shots at the boys and he himself fired one round from his shotgun.

As it later developed, the three young Negroes were engaged in no criminal activity. Their names were Raymond Brewer, Adrian Richardson and Larry Ward. Brewer and Richardson were 15 years old; Ward was 16. They had been in a nearby roller skating rink watching the skaters. They started walking northward on Del Paso Boulevard in the direction of the Green Olive bar. They saw two people cross the street and try unsuccessfully to enter the Green Olive bar. Curious, they peered into the window of the Green Olive bar to see if anybody was inside. They continued on their way and turned into the alley immediately north of the bar, utilizing the alley as a customary shortcut to their homes. Richardson was carrying a red-colored broom handle, tapping it on the ground and using it almost like a cane. Raymond Brewer had a croquet mallet handle partially inserted in his sleeve and was swinging it. They had had trouble with dogs and carried the sticks for protection. When they emerged from the alley on Arden Way they looked across the railroad tracks and saw two men who were wearing white coats and appeared to have shotguns. One man yelled "Hey" and stood up, at which the three boys turned and ran back toward Del Paso Boulevard. They turned at the Green Olive bar and continued running south on Del Paso Boulevard. None of them heard any shouting. At no time did Richardson hear the officers calling out, ordering them to halt or identifying themselves as police.

As the three boys fled up Del Paso Boulevard Somers fired three rounds from his revolver and LaChapelle fired his shotgun once. A bullet from Somers' revolver ricocheted from the pavement, superficially wounding Raymond Brewer's leg. He was struck in the back by a double-o pellet from LaChappelle's shotgun. Adrian Richardson picked Brewer up, apparently in piggy-back style, and continued around the corner of Del Paso Boulevard and Edgewater Way. Raymond Brewer then fell off Richardson's back. The shotgun pellet in his back had inflicted the fatal wound.

Earlier, Sergeant Scott (an off-duty police officer) and Irene Manning, his fiancee, had crossed Del Paso Boulevard toward the Green Olive bar,

when they saw the three boys walking in the direction of the bar. The boys were 20 or 30 feet away. One of the boys was carrying a stick diagonally from his waist to his shoulder. At first Miss Manning thought the object was a gun; at second glance, she saw it was a stick.

There is no significant conflict in the evidence. Although most of the witnesses described shouts of "Stop, police," the dead boy's companions, Adrian Richardson and Larry Ward, testified that they did not hear such shouts.

Penal Code section 192 defines involuntary manslaughter as a killing "in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection. . . ." There is no claim and no evidence that Raymond Brewer's death resulted from an unlawful act. Essence of the charge against Somers is the "commission of a lawful act which might produce death . . . without due caution and circumspection."

In *People* v. *Penny*, 44 Cal.2d 861, 869 [285 P.2d 926], the California Supreme Court pointed out that the statutory phrase "without due caution and circumspection" is the equivalent of criminal negligence. In dealing with a motion to set aside an indictment or information for negligent manslaughter, the parameters of judicial review are somewhat different—not greater or less but different—from those prevailing as to intentional felonies. In general, criminal liability is premised on intentional violations of the law, that is, conduct characterized by criminal intent, known to the law as *mens rea*. Negligent manslaughter, in contrast, entails the imposition of penal consequences for unintended action. (See Fletcher, *The Theory of Criminal Negligence: A Comparative Analysis,* 119 U.Pa.L.Rev. 401; Comments, 81 Yale L.J. 949, 16 Buffalo L.Rev. 749.)

In criminal as in civil negligence trials, the fact-finding body must ascertain not only the historical facts ("what happened") but also whether the defendant's conduct violated the law's standard of care. In moving from the first to the second inquiries, the jury is asked to decide whether liability flows from facts which (it has decided) are completely fixed and ascertained. In civil actions legal analysts have recognized that when the jury goes beyond deciding "what happened" and formulates the particular standard of conduct by which it determines whether the defendant acted negligently, it is really drawing a conclusion of law. (*Mosley* v. *Arden Farms Co.,* 26 Cal.2d 213, 223 [157 P.2d 372, 158 A.L.R. 872], concurring opinion; *Toschi* v. *Christian,* 24 Cal.2d 354, 364 [149 P.2d 848], concurring opinion; *Loper* v. *Morrison,* 23 Cal.2d 600, 611 [145 P.2d 1],

dissent; *Farrell* v. *Waterbury Horse R. Co.,* 60 Conn. 239 [21 A. 675, 676-677]; Prosser on Torts (4th ed. 1971) p. 207; Weiner, *The Civil Jury Trial and the Law-Fact Distinction,* 54 Cal.L.Rev. 1867, 1876-1880; Brown, *Fact and Law in Judicial Review,* 54 Harv.L.Rev. 899; cf. *Yakov* v. *Board of Medical Examiners,* 68 Cal.2d 67, 74, fn. 7 [64 Cal.Rptr. 785, 435 P.2d 553].) The jury does not have unlimited power to find a party negligent; at some point the court, trial or appellate, may intervene to review the jury's conclusion. In civil actions, the jury's decision for or against negligence will remain undisturbed if the circumstances admit of a reasonable doubt (*Warner* v. *Santa Catalina Island Co.,* 44 Cal.2d 310, 318 [282 P.2d 12]; *Mosley* v. *Arden Farms Co., supra,* 26 Cal.2d at p. 217) and " 'may be determined as a matter of law only if reasonable men following the law can draw but one conclusion from the evidence presented.' " (*Schmitt* v. *Henderson,* 1 Cal.3d 460, 463 [82 Cal.Rptr. 502, 462 P.2d 30]; see also, *Hogue* v. *Southern Pacific Co.,* 1 Cal.3d 253, 259 [81 Cal.Rptr. 765, 460 P.2d 965].)

A similar division between fact-finding and law application occurs where criminal negligence is the basis of liability. The grand jury and trial jury are governed by different levels of certitude, the former needing only probable cause for the accusation, the latter requiring proof of guilt beyond a reasonable doubt. ■ In reviewing a grand jury indictment for negligent manslaughter, a reviewing court may intervene only if reasonable men following the law may draw but one conclusion—that there is no probable cause for believing the defendant guilty of criminal negligence.

■ The transcript of the grand jury hearing which resulted in Somers' indictment does not disclose what conduct the district attorney pointed to as the alleged criminal negligence. In the superior court argument on Somers' motion to set aside the indictment, the chief deputy district attorney declared that the negligence consisted of Somers' radio broadcast erroneously stating that three Negroes were coming out of the Green Olive bar armed with shotguns. In this court the Attorney General expands the factual basis for the charge by urging that Somers negligently fired his revolver at Raymond Brewer, thus causing LaChappelle to fire the fatal round from his shotgun.

The grand jury's action must be measured against the law's standard of criminal negligence. The leading California case, *People* v. *Penny, supra,* 44 Cal.2d at pages 879-880, points out that something more than ordinary negligence is needed to support guilt of involuntary manslaughter. It declares that the defendant must have acted in an " 'aggravated, culpable, gross, or reckless' " manner, a manner so imprudent " 'as to be incom-

patible with a proper regard for human life, or, in other words, a disregard of human life or an indifference to consequences.' "

There is no significant conflict in the evidence. The sole issue is the grand jury's assessment of Somers' erroneous identification of the three suspects and of the events flowing from that broadcast. ■ Whether the conduct was criminally negligent must be determined from the conduct itself and not from the resultant harm. (*People* v. *Kilvington,* 104 Cal. 86, 93 [37 P. 799]; *People* v. *Villalobos,* 208 Cal.App.2d 321, 327 [25 Cal. Rptr. 111]; *People* v. *Rodriguez,* 186 Cal.App.2d 433, 440 [8 Cal.Rptr. 863].)

■ The holdup gang's activities had created a tense and menacing situation. Somers and his coworkers were engaged in a dangerous police mission. Less than an hour earlier Somers had received a radio broadcast concerning three Negroes who may have been "casing" a nearby bar. A second broadcast told him of suspicious actions of three Negroes in the vicinity of the Green Olive bar. His own broadcast turned out to be mistaken—the three young Negroes he saw were carrying sticks and not shotguns; they had been walking past the Green Olive and had not emerged from it. The broadcast, nevertheless, was an exercise of police judgment made in the face of a pressing and ostensibly dangerous situation. The danger that these were in fact the robbers precluded attempts to verify that the sticks were not shotguns and that the three persons had not emerged from the Green Olive bar; instead, Somers chose to act on the surface appearances. If the three suspects were the robbers, a shoot-out was a possibility; if they were not, then, according to reasonable expectation, they would hear and obey the officers' commands to stop. This expectation was not fulfilled. Either they did not hear or understand the commands or they chose to disregard them. The flight of the three youths could only confirm Sergeant Somers' belief that these were three robbers and not innocent pedestrians. The tragic death of an innocent youth followed.

Reasonable persons *following the law* were required to set to one side the hindsight that death ensued; to abstain from considering whether Somers' conduct amounted to ordinary negligence; were required, instead, to measure his conduct by the standard of aggravated and culpable negligence fixed by law. To reasonable persons following the law, no other conclusion is possible than this: that Somers' erroneous conduct was not aggravated, culpable, gross or reckless; that it did not manifest disregard of human life or an indifference to consequences. California law recognizes that one person may cause another's death by conduct which is not

criminally culpable, for it absolves those who commit an act under a mistake of fact which disproves any criminal intent and those who commit the act through misfortune or by accident when there was no evil intention or culpable negligence. (Pen. Code, § 26, subds. 4, 6.) There is a total absence of evidence of Sergeant Somers' disregard for life or of his indifference to consequences, hence a total absence of evidence to warrant a trial upon the issue of criminal negligence.

Let a writ of prohibition issue as prayed.