[Crim. No. 13945. Fourth Dist., Div. One. Dec. 23, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
HERMAN G. MARTIN, Defendant and Appellant.

[Crim. No. 15681. Fourth Dist., Div. One. Dec. 23, 1983.]

In re HERMAN G. MARTIN on Habeus Corpus.

## COUNSEL

Gerald B. Glazer, Emry J. Allen, Glazer & Allen and Glazer, Glazer & Allen for Petitioner and Defendant and Appellant.

John K. Van de Kamp, Attorney General, Patricia D. Benke and Louis R. Hanoian, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**STANIFORTH, J.**—A jury found Herman G. Martin guilty of conspiracy to commit extortion (Pen. Code, §§ 182, subd. 1, 518), conspiracy to commit assault with a deadly weapon (§§ 245, subd. (a), 182, subd. 1), murder (§ 187), and simple assault (§ 240). The jury also found Martin was armed with a firearm during the commission of the conspiracies and murder (§ 12022, subd. (a)). The jury found the murder to be second degree. Martin was sentenced to 15 years to life for murder plus a 1-year enhancement. Sentencing for the conspiracies was stayed (§ 654). Martin was sentenced to a concurrent six-month custody in county jail for assault with a deadly weapon. The issues on appeal concern jury instructions, the trial court's discretion in permitting testimony and examination of witnesses, sufficiency of the evidence, a pretrial motion to dismiss, and prosecutorial misconduct. The appeal is accompanied by and has been consolidated with a petition for habeas corpus based on the prosecution's failure to disclose inducements for witness' testimony and the prosecution's suppression of evidence by intimidating witnesses.

## FACTS

La Jolla attorney Richard Crake was murdered by Andrew James Powell on May 12, 1981. The death was probably the result of a severe blow to the head. Briefly, in the light most favorable to the judgment, the evidence shows Martin and Crake were embroiled in civil litigation arising from a dispute over a real estate transaction at the Sports Arena Square shopping center. During the course of discovery Martin became dissatisfied with the posture of the litigation. During a deposition Martin had threatened Crake with violence.

Michelle Goff worked for Martin's insurance company. Powell was Goff's boyfriend and she introduced him to Martin. Martin hired Powell on March 23, 1981. Martin knew Powell could not make his child support payments. Martin also knew Powell was afraid he would be jailed for failure to pay. Martin used this as leverage and told Powell he wanted Powell to collect money Crake owed Martin. Martin told Powell to collect $100,000 from Crake and to beat him up.

Martin gave Powell Crake's picture and business address. When Powell would not go to Crake's business, Martin supplied Crake's home address. Powell and a friend went to this address but discovered Crake no longer lived there. Powell called Martin long distance to tell him this address was incorrect.

Martin obtained Crake's new address by contacting United States Marshal James Murphy telling Murphy he needed the address to serve papers in conjunction with his civil suit. Murphy provided Martin with Crake's address. Martin gave this address to Powell along with the keys to Martin's car and a bag containing a gun.

Powell and a friend drove to Crake's house on May 12, 1981. They arrived at the guard station at approximately 9 p.m. Powell gave the guard a false name. The Crake family had returned from dinner approximately 9 p.m. Powell and his friend rang the doorbell and Crake answered. Powell sent the friend to the car and then told Crake he was there to collect $100,000 for Martin. Powell and Crake got into a fight. Powell shot Crake in the arm with Martin's gun. Powell hit Crake in the head with the gun between six and sixteen times. The blows eventually caused Crake's death. Crake's wife attempted to stop Powell but he pushed her away and fired the gun at her. Crake's daughter threw shoes and books at Powell.

Powell covered with blood returned to the friend's car. They drove to Powell's house where he made a toll call to Martin, telling him the dirty

work was done. When Goff returned at 10 p.m. she found blood on the carpet, shoes in the bathtub, and blood on Powell's jacket. Powell disposed of the jacket and the gun in a nearby dumpster scheduled to be picked up the following morning.

DISCUSSION

I

Jury Instructions

Martin raises two challenges to the jury instructions: The first question is whether Martin was entitled to the instruction announced in *People* v. *Yarber* (1979) 90 Cal.App.3d 895 [153 Cal.Rptr. 875], rather than the standard CALJIC instruction No. 3.01. The California Supreme Court has granted hearing in several cases presenting this issue.[1]

■ This court follows the general rule following a long line of cases finding CALJIC No. 3.01 sufficient. "As is said in *People* v. *Ott* (1978) 84 Cal.App.3d 118, at page 130 . . . , 'aiding in the commission of the crime with knowledge of the wrongful purpose of the perpetrator *eo ipso* establishes the criminal intent . . . "*the criminal intent of the aider and abettor is presumed from his actions with knowledge of the actor's wrongful purpose*" (italics added)' [citation]. We might add to these truths the observation that since our system of justice entrusts to the jurors the vast power of drawing any inference that can reasonably be drawn from substantial evidence and we forever bind ourselves to those inferences properly drawn, it would be demeaning of jurors' intelligence to instruct them, in addition, on the clear implication of intent that flows logically and necessarily from the words of the CALJIC No. 3.01 standard instruction. The standard CALJIC No. 3.01 is all that is required." (*People* v. *Flores* (1982) 128 Cal.App.3d 512, 525 [180 Cal.Rptr. 368].)

*Yarber,* by its own holding, provides an instruction for exceptions to this general rule: "The *Ellhamer/Ott* [*People* v. *Ellhamer* (1962) 199 Cal.App.2d 777, 782 (18 Cal.Rptr. 905); *People* v. *Ott* (1978) 84 Cal.App.3d 118, 130 (148 Cal.Rptr. 479)] synthesis that intent is inferred from the knowledge of the aider and abettor of the perpetrator's purpose is sound, generally, as a matter of human experience, but we cannot extrapolate therefrom, *as a matter of law* [emphasis added], that the inference

---

[1]*People* v. *Beeman,* Crim. 22525, hearing granted March 17, 1982, *People* v. *Valenzuela,* Crim. 22648, hearing granted June 16, 1982, and *People* v. *Sims,* Crim. 22952, hearing granted January 27, 1983.

*must* be drawn. Intent is what must be *proved*; from a person's action with knowledge of the purpose of the perpetrator of a crime, his intent to aid the perpetrator can be *inferred*. In the absence of evidence to the contrary, the intent may be regarded as established. But where a contrary inference is reasonable—where there is room for doubt that a person intended to aid a perpetrator—his knowledge of the perpetrator's purpose will not suffice." (*People* v. *Yarber, supra,* 90 Cal.App.3d 895, 916; fn. omitted.)

The *Yarber* instruction is appropriate where there are facts to support an inference although defendant actually aided in the commission of the crime the defendant did not by this action intend to do so. Martin produces "no hinge or loop to hang a doubt on." CALJIC No. 3.01 was properly given.

■ Martin next argues the trial court's instructions on homicide created "hopeless confusion" in the minds of the jury by offering alternative theories: felony murder based on the felony of conspiracy and second degree murder as the result of Martin's responsibility for all the criminal conduct of his coconspirator.

■ It is a fundamental rule the jury instructions must be read together and understood in context as presented to the jury. Whether a jury has been correctly instructed depends upon the entire charge of the court. (*People* v. *Mardian* (1975) 47 Cal.App.3d 16, 46 [121 Cal.Rptr. 269]; *People* v. *Flores* (1981) 115 Cal.App.3d 67, 83 [171 Cal.Rptr. 365].) We assume jurors are intelligent persons capable of understanding and correlating jury instructions. (*People* v. *Yoder* (1979) 100 Cal.App.3d 333, 338 [161 Cal.Rptr. 35]; *Flores, supra,* 128 Cal.App.3d at p. 525.) ■ On review even if an erroneous instruction is included reversal is required only when it appears the error was likely to have misled the jury. (*People* v. *Mardian, supra,* 47 Cal.App.3d at p. 46; *People* v. *Mayberry* (1975) 15 Cal.3d 143, 159 [125 Cal.Rptr. 745, 542 P.2d 1337]; *People* v. *Gordon* (1973) 10 Cal.3d 460, 470 [110 Cal.Rptr. 906, 516 P.2d 298].)

■ Here, the entire case was presented on the theory Martin was responsible for Powell's conduct because Martin coerced Powell to find Crake, collect the $100,000, and beat him up. Approximately nine pages of jury instructions carefully define conspiracy, principals, aiding and abetting, the extent of responsibility for accomplices, etc. The single instruction causing Martin's complaint is: "If a person while committing a felony inherently dangerous to human life causes another's death, malice is implied, and the crime is murder." ■ ■ ■ ■ This single instruction would not have misled the jury.[2]

---

[2]Even though we conclude the instruction did not affect the correctness of the verdict, Martin requested it and the doctrine of invited error precludes his complaint. (*People* v. *Perez* (1979) 23 Cal.3d 545, 549, fn. 3 [153 Cal.Rptr. 40, 591 P.2d 63].)

The trial court specifically instructed: "The defendant is charged in Count III of the Information with the commission of the crime of murder, a violation of Section 187 of the Penal Code.

"Ladies and gentlemen, as has been argued here, and I will instruct you, that that has to be on the conspiracy theory if at all. And that it has to be a foreseeable part of that conspiracy, as I have defined it for you." ██ ██ ██ ██ ██ This comment clarifies for the jury Martin's responsibility is based on the acts committed in furtherance of and during the course of the crimes contemplated and not purely for the existence of the conspiracy itself.[3] The trial court did not improperly instruct on a felony murder.

## II

### Rulings on the Testimony of Defense Witnesses

Martin complains he was denied his right to confrontation by the trial court's limitation of the cross-examination of Andrew Powell and James Murphy. He also argues the court abused its discretion when it failed to grant immunity to proposed defense witnesses. Finally, he challenges the trial court's ruling under Evidence Code section 352 admitting the statement of a former Assistant United States Attorney to the effect Martin could commit perjury.

██ Martin claims he should have been allowed to impeach Powell using specific instances in which Powell had lied in the past. The trial court properly ruled impeachment may not be based on past acts of misconduct nor on collateral matters. The court specifically found the examination would be too time consuming under Evidence Code section 352 and Martin could introduce evidence, as he did, to show Powell's reputation, thus achieving the same result properly. Testimony from Powell's girlfriend, his former

---

[3]The law does not require direct proof of Martin's intent to murder. The conviction will stand even if a coconspirator did not contemplate all the acts necessary to achieve the aim of the conspirator and even though the coconspirator was not present at the time the acts were committed and did not know of the commission. (*People* v. *Foster* (1963) 223 Cal.App.2d 275 [35 Cal.Rptr. 760]; *People* v. *Brawley* (1969) 1 Cal.3d 277 [82 Cal.Rptr. 161, 461 P.2d 361].) In *Castro* v. *Superior Court* (1970) 9 Cal.App.3d 675, 693 [88 Cal.Rptr. 500], the appeal court (Kaus) cited: "The stark fact of vicarious criminal liability for acts of coconspirators 'within the reasonable and probable consequences of the common unlawful design.' [Citations.] *These may be acts, which, as such, may never have been contemplated by a particular member of the conspiracy.*" (Italics added; fn. omitted.) (See also *People* v. *Kauffman* (1907) 152 Cal. 331, 334-336 [92 P. 861], vicarious liability for first degree murder where target crime of conspiracy was burglary; *People* v. *Smith* (1966) 63 Cal.2d 779, 780-794 [48 Cal.Rptr. 382, 409 P.2d 222]; cf. *People* v. *Durham* (1969) 70 Cal.2d 171, 181 [74 Cal.Rptr. 262, 449 P.2d 198], distinguishing the intent required of an aider and abettor.)

commanding officer, a former employer and his former wife showed Powell had a reputation as a liar. Testimony of specific instances in which Powell made untruthful statements was unnecessary and could not be used to prove he acted in conformity with this character trait in this trial. (Evid. Code, § 1101, subd. (a).) Prior specific acts may not be introduced as proof of a witness' character for honesty and veracity to support or attack the witness' credibility. (Evid. Code, § 787; *People* v. *Antick* (1975) 15 Cal.3d 79, 97 [123 Cal.Rptr. 475, 539 P.2d 43]; *People* v. *Thompson* (1979) 98 Cal.App.3d 467, 475 [159 Cal.Rptr. 615]; *People* v. *White* (1971) 18 Cal.App.3d 44, 48 [95 Cal.Rptr. 576].) ■ The admissibility of evidence is the duty of the trial court and we will not disturb the court's rulings absent clear error or an abuse of discretion. (*People* v. *Alfaro* (1976) 61 Cal.App.3d 414, 423 [132 Cal.Rptr. 356].) No such abuse or error is shown.

Deputy Marshal James Murphy testified Martin obtained Crake's address from Murphy and talked to Murphy the day after the murder. On cross-examination defense counsel attempted to show Martin had once asked Murphy to locate a litigant in one of Martin's lawsuits. The court ruled this testimony beyond the scope of direct examination and irrelevant unless the testimony related to Powell's contact with Crake. Martin asserts this testimony would explain Powell's presence at Crake's for a lawful purpose, i.e., to locate the other litigant. Admittedly the testimony was marginally relevant to contradict Powell's explanation for his visit. ■ However the cross-examination was of Murphy and this testimony would not elicit " ' *any matter which may tend to overcome, qualify or explain the testimony given by a witness on his direct examination.*' (Italics added; [citations].)" (*Gallaher* v. *Superior Court* (1980) 103 Cal.App.3d 666, 671 [162 Cal.Rptr. 389]) nor would it affect facts or denials necessarily implied from the testimony in chief or contradict any facts stated in direct examination. (*Id.,* at p. 672; see also *People* v. *Zerillo* (1950) 36 Cal.2d 222, 229 [223 P.2d 223]; *People* v. *Bigelow* (1951) 104 Cal.App.2d 380, 387 [231 P.2d 881], cert. den. 342 U.S. 910 [96 L.Ed. 681, 72 S.Ct. 301].)

Finally, the offer of proof shows the testimony was hearsay; the out-of-court statement—Martin told Murphy he would send someone else to locate the litigant—was offered to prove Powell was sent to locate the litigant. (Evid. Code, § 1200, subd. (b).) In any event, there is no likelihood the jury's verdict would have been more favorable if Murphy had testified to this conversation. (Evid. Code, § 354; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

■ Martin claims the trial court abused its discretion by failing to grant immunity to three defense witnesses. Riley, Gross, and Wallace re-

fused to testify under their Fifth Amendment privileges against self-incrimination. It is offered Riley would have corroborated testimony showing Martin did not supply the gun used by Powell. Gross would have testified Powell said Martin was not involved. Wallace would have testified Powell told him Martin was not involved and it was Powell's plan to extort money from Crake.

Penal Code section 1324 permits immunity on the request of the district attorney. (*Daly* v. *Superior Court* (1977) 19 Cal.3d 132, 146 [137 Cal.Rptr. 14, 560 P.2d 1193].) In *People* v. *Sutter* (1982) 134 Cal.App.3d 806 [184 Cal.Rptr. 829], the defendant argued the court has jurisdiction to grant judicial immunity in addition to that provided in the statute. Defendant Sutter and codefendant Mayhew committed a robbery. Sutter drove the car; Mayhew entered and robbed a liquor store. Mayhew pled guilty while Sutter proceeded to trial. Sutter offered Mayhew's testimony would show Sutter did not know Mayhew was going to rob the store when he went in to buy beer because Sutter remained in the car. Mayhew asserted his Fifth Amendment privilege to shield evidence of a similar robbery in another prosecution. The People would not request immunity because the second robbery file was still open. The Court of Appeal affirmed because the immunity issue had not been properly preserved on appeal. However, in response to a dissent the court went on to state the decision to grant immunity is discretionary. The decision rests first with the district attorney and in limited circumstances with the court. The *Sutter* dissenting judge also noted immunity is discretionary and must be clearly limited. An important factor is whether the defense witness is available to testify. In addition, the testimony must be clearly exculpatory, the testimony must be essential and there must be no strong contrary governmental interests. Here, although all three witnesses were available, their testimony is not clearly exculpatory in that it only contradicts Powell's assertion he received the gun from Martin and Martin coerced him into performing the crime. This testimony was offered by another defense witness, Agular, and therefore the cumulative statements of three additional witnesses were not essential. Finally, the trial court expressly ruled immunity would not be proper due to the grave and serious circumstances of this crime.

██ In *In re Marshall K.* (1970) 14 Cal.App.3d 94 [92 Cal.Rptr. 39], the court said: "The cases hold that the state is under no obligation to make a witness available to testify for a defendant, or on behalf of the People for that matter, by granting him immunity from prosecution." (*Id.*, at p. 99.)

██ Although there is federal and California precedent for limited judicially declared use immunity, no case has been cited which would permit a trial court to require a witness to testify after his assertion of a Fifth

Amendment privilege. In view of this scant authority and the Legislature's express delegation of the authority to grant immunity to the prosecution, there was no abuse of discretion in the trial court ruling.

 Alternatively, Martin insists statements made by these witnesses to a police investigator are admissible exceptions to the hearsay rule as declarations against penal interest under Evidence Code section 1230. "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability . . . a reasonable man in his position would not have made the statement unless he believed it to be true." Here, although the witnesses' statements were clearly against their penal interest, it is not certain a reasonable person in their position would not have made the statement unless they were true. The trial court was faced with allegations Martin had bought and paid for this testimony and that these witnesses had nothing to lose by virtue of the fact they were currently incarcerated on other charges. The trial court's ruling to exclude this hearsay evidence was not an abuse of discretion.

 Martin next argues the trial court's ruling under Evidence Code section 352 admitting the testimony of former Assistant United States Attorney Robert Knoll to the effect Martin was willing to commit perjury was an abuse of discretion. The statement showed Martin was willing to go to extraordinary lengths to assert his interests. The evidence tended to prove Martin's motive to take the law into his own hands based on his frustration with the civil litigation. Evidence Code section 352 requires a balancing of probative value and prejudicial effect. The evidence did not show Martin had committed perjury at any time, Martin did not testify so there was no inference he currently was committing perjury and the statement only showed a possibility he was capable of criminal behavior. It was not unduly prejudicial.

Even without this evidence, there is other more powerful evidence showing Martin's motive and plan to harm Crake. It is not reasonably probable a different result would have been reached if the trial court's ruling were error.

### III

### Motion for Mistrial

 During the trial a prosecution witness had an emotional outburst in which she told Martin he was guilty. The court questioned each juror in-

dividually to determine whether this unsolicited remark would affect their ability to unemotionally and independently evaluate the case. The court was satisfied each juror could ignore the remark and admonished the jury against using the remark for any purpose. Absent any evidence to the contrary, we assume the jury was able to follow the trial court's admonition and disregard the statement. Juries often hear unsolicited and inadmissible comments and in order for trials to proceed without constant mistrial, it is axiomatic the prejudicial effect of these comments may be corrected by judicial admonishment; absent evidence to the contrary the error is deemed cured. (*People v. Ryan* (1981) 116 Cal.App.3d 168, 184 [171 Cal.Rptr. 854]; *People v. Seiterle* (1963) 59 Cal.2d 703, 710 [31 Cal.Rptr. 67, 381 P.2d 947], cert. den. 375 U.S. 887 [11 L.Ed.2d 116, 84 S.Ct. 163]; *People v. Sandoval* (1970) 9 Cal.App.3d 885, 888 [88 Cal.Rptr. 625].)

IV

Substantial Evidence Supports the Verdict

Martin urges there is insufficient evidence to support each count. We review the elements of each conviction and recite the evidence supporting that element. ▮▮ A conspiracy is an agreement to commit an unlawful object and in furtherance of the agreement the commission of an overt act toward the achievement of that objective. (*People v. Fujita* (1974) 43 Cal.App.3d 454, 471 [117 Cal.Rptr. 757], cert. den. 421 U.S. 964 [44 L.Ed.2d 451, 95 S.Ct. 1952].) The agreement may be shown by circumstantial evidence and the defendant's conduct carrying out their mutual purpose is sufficient. (*People v. Lipinski* (1976) 65 Cal.App.3d 566, 575 [135 Cal.Rptr. 451]; *People v. Hardeman* (1966) 244 Cal.App.2d 1, 41 [53 Cal.Rptr. 168], cert. den. 387 U.S. 912 [18 L.Ed.2d 634, 87 S.Ct. 1700].) ▮▮ Powell testified Martin solicited him to collect money and beat up Crake. Martin threatened Powell with jail and the loss of his job if he refused to participate. Martin obtained Crake's current address and gave it to Powell. Powell then went to Crake's house, demanded the money, assaulted Crake and killed him. Powell's testimony is corroborated by the testimony of his girlfriend and Martin's other employees. This evidence is sufficient to support conviction for conspiracy to commit extortion and conspiracy to commit assault with a deadly weapon.

Martin attempts to argue the murder and assault were not in furtherance of the conspiracy because Powell had withdrawn from the conspiracy. This argument is directly contradicted by Powell's testimony of the conversation and his activities the night of the murder. Even though at times Powell refused to comply with Martin's instructions there is no question but that Powell went to Crake's house the night of the murder, demanded the mon-

ey, assaulted Crake and killed him. Even if Powell was reluctant at various times during the course of the planning stages of the crime, it is apparent he participated exactly as agreed, he so testified, and his testimony is corroborated by circumstantial evidence of other witnesses and the record of telephone calls between Powell and Martin the day and night of the murder.

 A coconspirator is guilty of any crime committed by his confederate which is a natural or probable act committed in furtherance of the conspiracy or any crime which is one of natural and probable consequence of the object of the conspiracy. (*People* v. *Brawley, supra,* 1 Cal.3d 277 [82 Cal.Rptr. 161, 461 P.2d 361].) The question of what constitutes a natural and probable consequence is one of fact for the jury. (*People* v. *Drolet* (1973) 30 Cal.App.3d 207, 217 [105 Cal.Rptr. 824].) A reasonable jury could find the assault and murder were a natural and probable consequence of Martin's instructions to collect the money and beat up Crake, his giving Powell Crake's address and his providing a gun. Substantial evidence supports this jury's conclusions.[4]

## V

### Prosecutorial Misconduct

Martin declares numerous incidents of prosecutorial misconduct compel reversal of the convictions. Martin first complains the prosecutor's argument was a direct comment on his failure to testify and thus requires reversal under *Chapman* v. *State of California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065], as a violation of *Griffin* v. *State of California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229]. *Griffin* holds the prosecutor may not comment upon a defendant's failure to take the stand and testify in his behalf. (*Griffin, supra, People* v. *Vargas*

---

[4]As a corollary to his challenges on the substantiality of the evidence, Martin claims the trial court should have dismissed the information under Penal Code section 995. Martin admits Powell's testimony at the preliminary examination so far as it related to Powell's contacts and relationship with Martin paralleled his testimony at trial. The trial court's ruling on a 995 motion requires a much lesser showing than that necessary for conviction. The determination is based on whether there is probable cause. Probable cause is established if a reasonable person would be led to believe and conscientiously entertain strong suspicion of the accused's guilt. (*Somers* v. *Superior Court* (1973) 32 Cal.App.3d 961 [108 Cal.Rptr. 630].) The trial judge is required only to weigh the evidence as a reasonable person for an inference, not for an absolute conviction, and if there is some evidence to support the information, the court does not examine its sufficiency. (*People* v. *Velasquez* (1975) 53 Cal.App.3d 547 [126 Cal.Rptr. 11].) All legitimate inferences are drawn in favor of the information. (*People* v. *Markin* (1973) 34 Cal.App.3d 58 [109 Cal.Rptr. 609].) Since we have found there is sufficient evidence to support a conviction beyond a reasonable doubt and a dismissal under section 995 only requires a showing of probable cause, it follows the 995 motion was properly denied.

(1973) 9 Cal.3d 470 [108 Cal.Rptr. 15, 509 P.2d 959].) Whether *Griffin* error is prejudicial depends upon whether the comment fills a gap in the prosecution's case or touches a live nerve in the defense. (*People* v. *Medina* (1974) 41 Cal.App.3d 438, 462 [116 Cal.Rptr. 133]; *People* v. *Morse* (1969) 70 Cal.2d 711, 730 [76 Cal.Rptr. 391, 452 P.2d 607], cert. den. 397 U.S. 944 [25 L.Ed.2d 124, 90 S.Ct. 959].)

 In this case the prosecution merely stated the obvious; he simply noted the difficulty proving a conspiracy is that it must often be proved by circumstantial evidence because the conspirators frequently do not testify.[5]

It is hard to see the argument focused attention on Martin's failure to testify by asserting that even without Powell's testimony, sufficient evidence supported a finding of conspiracy. The trial court's instructions telling the jury Martin's failure to testify could not be used to infer his guilt would have cured any potential harm from this limited comment.

The record shows several references and innuendos by the district attorney to Martin's alleged connection with the Mafia. Martin directs our attention to three instances. The first instance occurred during examination of Deputy District Attorney Charles Hayes:

"Q: Did that deal with things in his background?

"A: That's right.

"Q: What was Martin's response?

"A: Well, I specifically asked him whether he had any connection with Department of Justice.

---

[5]The text of the comment is: "Let me read an instruction. 'It is not necessary in proving a conspiracy to show a meeting of the alleged conspirators or the making of an express or formal agreement. The formation and existence of a conspiracy may be inferred from all the circumstances tending to show the common intent, and may be proved in the same way as any other fact may be proved, either by direct testimony of the fact or by circumstantial evidence or by both direct and circumstantial evidence.' Let me suggest that conspiracy, prosecution cases oftentimes include both conspirators as defendants and none of the conspirators testify. Let me suggest to you that you consider this case in that light for a while. Consider your job as finding whether or not Andrew Powell and Herman G. Martin are guilty of Count I, conspiracy to commit extortion and Count II and Count III and Count IV, both of them are sitting over here on trial. Neither one of them testified. No testimony from either of the coconspirators. You hear the evidence that you heard in this case without Andrew Powell's testimony? Would you find him guilty?"

At this point defense counsel asked for a bench conference wherein the prosecutor explained he was attempting to argue even without Powell's testimony sufficient circumstantial evidence could be found to show the conspiracy. The court denied motion for mistrial.

"Q: Did he tell you the answer to that?

"A: He said, yes, he did. He was connected with the Department of Justice. I asked him whether he was acquainted with the Mafia activities in New Jersey and he said—" On defense objection the question and answer were stricken, the district attorney was admonished and the defense motion for mistrial was denied. Although it is true one cannot unring a bell, the trial court instructed the jury they were not to consider answers which had been stricken from the record. We assume the jury understood and applied this instruction.

 During closing argument the district attorney attempted to discredit defense testimony by an illustration "inspired" by the cover of the book The Godfather:

"Okay. Well, I want to talk about the credibility of some witnesses for a little while, and I am reminded of a popular book that came out a few years ago, and it was also a successful movie; a book called 'The Godfather'. I am reminded of that book, at least, the cover, the cover of that book. I don't know if any of you read it, but the cover of that book has the name on it, and I can't remember exactly what it is. It is either a hand or some figure, and there is strings going down to the words and the name, I think, like a puppet; like a person pulling the strings on a puppet. A vision of the cover of that book came to my mind when some defense witnesses testified in this case.

"For example, Marcia Sharpe. She is the daughter of the defendant. Okay. She got on the stand as a defense witness, and the defense pulled a string for April 6. Her testimony was, April 6 my father was on a couch about 9:30 in his office and had to be taken to the doctor. That is the response the April 6 string got.

"Okay. I cross-examined her, tried to cross-examine her about that. I pulled an April 7th string, or April 6th string. 'Who else was there?' 'I don't remember.' 'Was Powell around?' 'I don't remember.' 'When did your father come back to work?' 'I don't remember.' This is just because the wrong person was pulling the strings."

Even though this illustration was unnecessary and may have been offered in bad faith, it does not amount to a dishonest act or an intent to persuade the jury by deceptive, reprehensible means. (*People* v. *Strickland* (1974) 11 Cal.3d 946, 955 [114 Cal.Rptr. 632, 523 P.2d 672].) Furthermore, in order to preserve this argument on appeal an objection must be made when the comment is made in order to give the trial judge an opportunity

to cure any harm caused by the comment. (*People* v. *Green* (1980) 27 Cal.3d 1, 27, 34 [164 Cal.Rptr. 1, 609 P.2d 468].) ▉▉▉ No such objection was made here and an admonishment could have cured any potential prejudicial effect of the illustration.

Martin last complains of the prosecution's analogy of Powell's testimony to the testimony of Jimmy Fratianno: "So, you know it is not hard in a case like this, in any conspiracy case, to run down the credibility of, or the character of, one of the coconspirators. People who conspire together to commit crimes are not decent, good, law-abiding, upstanding people. When one of them gets on the stand and testifies, it is easy to run down their credibility.

"Let me give you an example of a guy who has been in the press recently. Jimmy Fratianno. The guy has been a crook all his life. He has been a hit man. Okay? He has testified. [At this point in response to defense objection a bench conference was held and the prosecutor instructed to forego this illustration.]"

This incomplete analogy was abandoned after a bench conference and this limited comment could not in any way have affected the verdict following this month-long trial.

▉▉▉ Martin asserts prosecutorial misconduct because the prosecutor wilfully suppressed material evidence. This assertion is based on Martin's assumption the three defense witnesses who asserted their Fifth Amendment privileges did so because another defense witness was arrested. In *People* v. *Ruthford* (1975) 14 Cal.3d 399, 406 [121 Cal.Rptr. 261, 534 P.2d 1341], the court stated: "[W]hen the evidence which is suppressed or otherwise made unavailable to the defense by conduct attributable to the state bears directly on the question of guilt our initial inquiry is whether such conduct resulted in denial of a fair trial." In this case there is no offer of proof nor evidence the witnesses' decision to not testify was based on any conduct attributable to the state. In fact when the court was advised of the defense witnesses' arrest, the court stated the arrest had "nothing to do with this Court" although tactically it might have been "best left undone." Without conduct attributable to the prosecution there cannot be any wilfull suppression of evidence.

Martin raises a few more insignificant complaints. First, during closing argument the prosecutor remarked "those black guys upstairs in the jail didn't come in and testify that Powell tried to get a gun from them. His efforts in this regard, apparently, were not fruitful." The defense objection to this comment was sustained. Martin complains the prosecutor misstated

the law on conspiracy. It is the duty of the trial court, not the prosecutor, to instruct the jury on the law and the court instructed the jury correctly. The prosecution, defense and the court all told the jury that they would receive legal instruction from the court. The prosecutor's comment had no effect on these instructions. Finally, Martin argues the prosecutor questioned a witness on privileged information. The defense objections were sustained and the jury was instructed questions are not evidence. No harm accrued from these questions.

## VI

### Petition for Writ of Habeas Corpus

Martin's motion to consolidate his petition for writ of habeas corpus with the related appeal is granted. The petition presents four arguments: prosecutorial misconduct, deprivation of a fair trial based on witness intimidation, the prosecutor failed to disclose inducements had been offered to key prosecution witnesses in exchange for their testimony and newly discovered credible evidence undermines the entire case. The allegations in the petition for writ of habeas corpus concerning prosecutorial misconduct and witness intimidation have been dispensed with on the merits in the opinion on appeal. (See part V, above.) A potential witness' assertion of the Fifth Amendment privilege against self-incrimination is not conduct attributable to the prosecutor.

▮▮▮ Martin next argues the prosecutor's failure to disclose inducements made to key prosecution witnesses in exchange for their testimony deprived him of a fair trial. This allegation concerns the testimony of Powell and Steven Jarrett. Martin offers exhibits to show the district attorney offered to intercede on Powell's behalf to allow him to obtain more favorable treatment in the Department of Corrections. Similarly he offers exhibits to show Jarrett was promised more favorable treatment at judgment and sentencing in another case. Martin concedes such inducements are common prosecutorial tools and that these particular promises were not necessarily improper. His argument, however, is based on the failure to disclose the fact inducements were made. (*People* v. *Ruthford, supra,* 14 Cal.3d 399, 406, 408; *In re Ferguson* (1971) 5 Cal.3d 525, 531 [96 Cal.Rptr. 594, 487 P.2d 1234].)

▮▮▮ A prosecutor must disclose substantial material evidence favorable to the accused even without a request. (*People* v. *Ruthford, supra,* 14 Cal.3d at p. 406; *In re Ferguson, supra,* 5 Cal.3d at p. 533; *Brady* v. *Maryland* (1963) 373 U.S. 83, 87 [10 L.Ed.2d 215, 218-219, 83 S.Ct. 1194]; *Giglio* v. *United States* (1972) 405 U.S. 150, 155 [31 L.Ed.2d 104,

109, 92 S.Ct. 763]; *Napue* v. *Illinois* (1959) 360 U.S. 264, 269 [3 L.Ed.2d 1217, 1221, 79 S.Ct. 1173].) Where the undisclosed evidence is that of an inducement for testimony, both the failure to disclose this interest to the jury or to the defense and the failure to correct a misleading statement that no inducement was offered denies the defendant a fair trial where "the evidence thus suppressed by the prosecution related to the credibility of a key witness whose testimony may have been determinative of guilt or innocence." (*People* v. *Ruthford, supra,* 14 Cal.3d at p. 406; citing *Giglio* v. *United States, supra,* 405 U.S. at p. 154 [31 L.Ed.2d at pp. 108-109].)

 Although Jarrett's testimony was important, Powell's testimony as the coconspirator was pivotal. Both witnesses denied promises of lenient treatment had been made to them in exchange for their testimony. The district attorney sat by as this misleading testimony entered the record and in the case of Powell argued: "There is no evidence that he was given any kind of deal for his testimony." (See *People* v. *Varona* (1983) 143 Cal.App.3d 566, 570 [192 Cal.Rptr. 44].) Aside from the exhibits accompanying the petition for habeas corpus, it appears in the record this conduct was more than an oversight and beyond benign neglect. "The duty of the district attorney is not merely that of an advocate. His duty is not to obtain convictions, but to fully and fairly present to the court the evidence material to the charge upon which the defendant stands trial, and it is the solemn duty of the trial judge to see that the facts material to the charge are fairly presented. [Citations.] In the light of the great resources at the command of the district attorney and our commitment that justice be done to the individual, restraints are placed on him to assure that the power committed to his care is used to further the administration of justice in our courts and not to subvert their procedures in criminal trials designed to ascertain the truth.

". . . Although our system of administering criminal justice is adversary in nature, a trial is not a game. . . ." (*In re Ferguson, supra,* 5 Cal.3d 525, 531.)

 In this case the prosecutor had a duty to disclose to the court the misleading testimony of the prosecution witnesses. The prosecution's failure resulted in the suppression of substantial material evidence concerning the credibility of chief witnesses. Nonetheless we must evaluate whether this affected the outcome of the trial. We are satisfied that had the jury known the witnesses had been promised more lenient treatment in exchange for their cooperation, it would not have affected the verdict. Both witnesses faced severe penal sanctions and the district attorney's offer to intercede would only have changed the character of the sanctions. Both witnesses had

other motives to testify. Both witnesses' testimony was corroborated by other direct testimony and circumstantial evidence.

██ Martin's final argument is new evidence has become available which undermines the entire case of the prosecution and could not have been discovered by diligent pretrial investigation. (*In re Hall* (1981) 30 Cal.3d 408, 417 [179 Cal.Rptr. 223, 637 P.2d 690].) The proposed testimony is that of Wallace Jackson. Jackson was Powell's cellmate in county jail before trial. Martin asserts Jackson would testify Powell and Wallace concocted a scheme to frame him. None of the information supplied by Jackson's declaration constitutes evidence undiscoverable before trial. Both Jackson's and Wallace's declarations state they were cellmates along with Richard Tiebout and Powell during the defense investigation. The defense investigator interviewed Wallace and Tiebout and could just have easily interviewed Jackson. No new evidence which would have undermined the prosecutor's case is presented and the potential witness was discoverable before trial.

## VII

### Disposition

The judgment on appeal is affirmed. The petition for writ of habeas corpus is denied. The defendant's motion for bail on appeal is denied.

Cologne, Acting P. J., concurred.

**WIENER, J.,** Concurring and Dissenting.—I concur with the majority in affirming Martin's convictions of conspiracy to commit extortion, conspiracy to commit assault with a deadly weapon and simple assault. However, I believe instructional error requires reversal of Martin's conviction of second degree murder. Martin was neither charged with nor tried for conspiracy to commit murder, reflecting the district attorney's assessment before trial that there was insufficient evidence to establish an agreement between Martin and Powell that Powell was to murder Crake. The deputy district attorney who tried the case did so consistently, but incorrectly, with these pleadings on the theory that the unintended killing was the objectively foreseeable result of the charged conspiracies, neither of which can legally support a finding of second degree murder.

Jury instructions may not be considered in the abstract. They must be evaluated in the context of the actual trial, considering the theories advanced and the evidence presented. In the case before us the jury was directed to limit its consideration of Martin's guilt on the murder count to "the *con-*

*spiracy* theory if at all." (See *ante,* p. 158, italics supplied.) In effect, the jury was told to disregard the instructions on aiding and abetting. My assessment of the record is shared by the Attorney General who asserts: "The plain language of the above instruction indicates the jury was not to consider an aiding and abetting theory when they evaluated the murder count." "[They were told to] evaluate the murder count using a conspiracy theory *exclusively.*" (Italics supplied.)

Excising the aiding and abetting instructions, it appears the jury convicted Martin on the following instructions. The jury first determined Martin was guilty of the conspiracies to commit extortion and to commit assault with a deadly weapon. As a coconspirator, the jury was then told, Martin had the same culpability as Powell: "Each member of a criminal conspiracy is liable for each act and bound by each declaration of every other member of the conspiracy if said act or said declaration is in furtherance of the object of the conspiracy. [¶] The act of one conspirator pursuant to or in furtherance of the common design of the conspiracy is the act of all conspirators. Every conspirator is legally responsible for the act of a coconspirator that follows as one of the probable and natural consequences of the object of the conspiracy even though it was not intended as a part of the original plan and even though he was not present at the time of the commission of such act." (CALJIC No. 6.11.) Finally, in determining whether second degree murder was a "probable and natural consequence of the object of the conspiracy," the jury was permitted to apply part of CALJIC No. 8.30 and all of CALJIC No. 8.31 (1981 rev.): "Murder of the second degree is [also] the unlawful killing of a human being with malice aforethought when there is manifested an intention unlawfully to kill a human being . . . .[1] [¶] Murder of the second degree is [also] the unlawful killing of a human being as the direct causal result of an intentional act involving a high degree of probability that it will result in death, which act is done for a base, antisocial purpose and with wanton disregard for human life. [¶] When the killing is the direct result of such an intentional act, it is not necessary to establish that the defendant intended that his act would result in the death of a human being."

None of these instructions informed the jury they were to focus on Martin's state of mind in determining whether he harbored the malice necessary for conviction of second degree murder. To complicate matters further, the case was tried and argued in a manner which allowed the jury to substitute Powell's state of mind for that of Martin's in finding Martin guilty of second degree murder.

---

[1]The court omitted the concluding phrase of CALJIC No. 8.30, as follows: ". . . but the evidence is insufficient to establish deliberation and premeditation."

The deputy district attorney argued that if the jury decided Powell acted for a base, antisocial purpose and with wanton disregard for human life, then Martin was guilty as a coconspirator since murder was a natural and probable consequence of the conspiracy. After saying he wanted to talk about "homicide law," the prosecutor argued:

"With respect to Count III [murder], this jury must decide the case of the People of the State of California versus Andrew Powell. You have to decide without regard to Herman Martin or any—just take him out of the picture for a minute. You have seen the evidence about Andrew Powell killing Richard Crake. You have to decide what kind of a killing that was, because the only thing that is important with respect to this conspiracy theory is, Andrew Powell, his state of mind and what kind of a homicide did he commit when he killed Crake.

" . . . . . . . . . . . . . . . . . . . . . . . . .

"First of all, the only instructions you are going to hear, the only choices you are going to get are between second degree murder and voluntary manslaughter or not guilty. The evidence is going to show this is a second degree murder. Homicide is the unlawful killing of someone. . . .

"Well, the first two of those you don't have any problem with. Mr. Crake was killed, and it was clearly an unlawful killing. The question is, did Andrew Powell have a state of mind that we described as malice aforethought? Because the difference between murder and manslaughter is the presence or absence of malice aforethought. If it is an unlawful killing and there is malice aforethought, it is murder. If there is no malice aforethought, it is manslaughter. That is it simply." The deputy district attorney proceeded to focus on Powell's state of mind, arguing:

"You tell us what he [Andrew Powell] intended to do. Don't let Andrew Powell tell you what his state of mind was. You tell him. . . . The jury can tell Herman Martin what Andrew Powell's state of mind was.

"I suggest to you Andrew Powell was full of malice, and the killing that resulted in this case clearly shows that. This is a second degree murder. Murder of a second degree is the unlawful killing of a human being with malice aforethought when there is manifested an intention to unlawfully kill a human being. That is called unpremeditated murder of the second degree. You will get that instruction.

" . . . . . . . . . . . . . . . . . . . . . . . . .

"Was there manifested an intention on Powell's part to kill Mr. Crake?

Clearly, there was. I mean, he beat him. He shot him. That manifested an intent to kill. Powell did second degree murder.''

The court's instructions to the jury, consistent with the prosecutor's argument, failed to inform the jury that in order to convict Martin of second degree murder it was Martin who had to act with either express or implied malice.

The court's error in permitting Powell's malice to be attributed to Martin was exacerbated by the court's error in partially instructing on felony murder. The court inexplicably gave part of CALJIC No. 8.51. The giving of that instruction seems "inexplicable" because the court rejected CALJIC Nos. 8.32 and 8.33. Those instructions present the basic second degree felony-murder rule and further provide that if a killing is done to further the common purpose of a conspiracy to commit a felony inherently dangerous to human life, all of the coconspirators are deemed to be equally guilty of murder of the second degree whether the killing is intentional, unintentional or accidental. The court's rejection of those instructions and the fact the prosecutor was prevented from arguing a felony-murder theory suggests the giving of part of CALJIC No. 8.51 was due to an oversight. Nonetheless, the jury was instructed: "If a person while committing a felony inherently dangerous to human life causes another's death, *malice is implied, and the crime is murder.* If while committing a misdemeanor inherently dangerous to human life he causes another's death, there is no malice, and he is guilty of manslaughter."[2] (Italics supplied.) The instruction was not supplemented, nor could it have been, by instructions defining the underlying dangerous felony or misdemeanor. Pursuant to the rationale of *People* v. *Ireland* (1969) 70 Cal.2d 522, 538-540 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323], the felony of assault with a deadly weapon cannot be used to support a second degree murder conviction on a felony-murder theory. Extortion also is unavailable as the underlying felony because it is not inherently dangerous to human life.[3] From the above instructions the jury could have erroneously found Powell guilty of felony murder. Combined

---

[2]Although this instruction is included in the packet of requested instructions submitted by Martin's counsel, the record does not indicate whether it was actually requested and rejected. Unlike other requested instructions upon which "rejected" is written, only a question mark appears on this instruction. Whether the question mark means the defense lawyer and/or the court had concern with the instruction or were undecided whether to request or reject the instruction is not clear from the record. Accordingly, the doctrine of invited error is inapplicable.

[3]In determining whether a felony is inherently dangerous to human life the elements of the felony must be considered in the abstract, not the particular facts of the case. (*People* v. *Henderson* (1977) 19 Cal.3d 86, 93 [137 Cal.Rptr. 1, 560 P.2d 1180].) Clearly, obtaining property from another with his consent by wrongful use of force or fear (Pen. Code, § 518) may be accomplished without inflicting mortal or life-threatening physical harm.

with the preceding conspiracy and second degree murder instructions and the prosecutor's argument focusing on Powell's rather than Martin's state of mind, the jury then could have erroneously concluded Martin, as Powell's coconspirator, was guilty of implied malice second degree murder.

Courts and commentators continue to question the mechanical application of artificial formulae to establish criminal liability. For example, the California Supreme Court ". . . has repeatedly criticized the felony-murder rule as a 'highly artificial' and 'barbaric' concept which '. . . "erodes the relation between criminal liability and moral culpability". . . ."'" (*People* v. *Dillon* (1983) 34 Cal.3d 441, 494 [194 Cal.Rptr. 390, 668 P.2d 697] (conc. opn. of Bird, C. J.).) Courts have historically equated the degree of criminal liability with the actor's state of mind. Mens rea has always been stressed to insure that punishment which society prescribes for a specific crime is directly related to the criminal purpose of the perpetrator. (See Pen. Code, § 20; 1 Witkin, Cal. Crimes (1963, and 1978 supp.) Elements of Crime, § 52.) Only recently, for example, this court held the objective standard of CALJIC No. 8.31 for implied malice second degree murder was inadequate because the instruction failed to require a finding the defendant acted with a *subjective* awareness that his conduct endangered the life of another. (*People* v. *Smith\** (Cal.App.).)

Paradoxically, the majority here affirms Martin's conviction of second degree murder on a conspiracy theory which allowed the jury to disregard Martin's state of mind. Instead, guilt was based on a simple but incorrect formula: conspiracy (of any felony) plus death equals second degree murder provided the death (1) was an objectively foreseeable event and (2) was caused by the coconspirator's death-resulting act.

In this case, there was ample evidence to convict Martin of aiding and abetting Powell's commission of second degree murder. The fact that Martin used a mercenary as an intermediary rather than acting himself does not immunize him from culpability. Accordingly, had the jury been asked to decide whether Martin, under all of the circumstances, acted with implied malice[4] in intentionally instigating a chain of events which directly resulted in Crake's death, it may well have answered affirmatively. Unfortunately, the jury was never given that opportunity. Accordingly, I conclude Martin's second degree murder conviction must be reversed. Regardless of Martin's apparent guilt of second degree murder, he is nonetheless entitled to a fac-

---

\*Reporter's Note: Deleted on direction of Supreme Court by order dated December 22, 1983.

[4]The deputy district attorney in argument acknowledged Martin did not act with express malice. He said "Herman Martin probably didn't want Richard Crake killed, didn't intend that to happen at all."

tual determination of each of the elements of that crime. (See *People* v. *Kent* (1981) 125 Cal.App.3d 207, 213, 214, fn. 7 [178 Cal.Rptr. 28].)

A petition for a rehearing was denied January 13, 1984, and appellant's petition for a hearing by the Supreme Court was denied April 19, 1984. Bird, C. J., and Kaus, J., were of the opinion that the petition should be granted.