Filed 11/27/13  P. v. Luong CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
|     Plaintiff and Respondent, | G047220 |
|        v. | (Super. Ct. No. 08WF2195) |
| HONG THAI LUONG, | O P I N I O N |
|     Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, W. Michael Hayes, Judge.  Affirmed.

Mark D. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Kristine A. Gutierrez and Felicity Senoski, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury convicted Hong Thai Luong of committing lewd acts upon four girls between the ages of eight and 10 in separate incidents as a school music teacher and at a tutoring center. (Pen. Code, §§ 288, subd. (a); 1203.066, subd. (a)(7) [punishment enhancement for multiple child victims].) He argues the trial court erred in denying his mistrial motion when the prosecutor failed to redact the names of two other girls the victim mentioned in a videotaped interview with a social worker. Based on the context of the interview, Luong argues the jury may have inferred the girls also were Luong's victims. As we explain, the reference was brief, vague, and the context did not necessarily suggest the two girls were themselves additional victims of uncharged lewd acts committed by Luong. Consequently, the trial court did not abuse its discretion in denying a mistrial. Similarly, the prosecutor did commit reversible error or misconduct in failing to ensure the names were redacted from the video, or in a separate incident in cross-examining Luong. Luong's challenges are therefore without merit, and we affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

In 2008, 52-year-old Luong was a music teacher and choir director at several schools, including St. Callistus Catholic School (St. Callistus), and he tutored students at the Paramount Learning Center (the Center). C. V. attended St. Callistus, where she took music lessons with Luong and participated in the school choir he directed. During music class, Luong sat C. on his lap while she played the piano, placing his hands on her waist and bouncing his leg up and down. On one occasion when C. was in third grade, she helped Luong put chairs away after choir practice and he called her over to him, grabbed her hand, pulled her to him, kissed her on the lips and placed his hand

2

underneath her shirt on her back. C. left the room for after-school daycare provided by the school, and reported the incident to her mother that night, who reported it immediately to the school principal.

That same year, fifth-grader Meagan L., her sister Sydney L., and their friend T.T. attended the Center, which was owned by Luong's girlfriend, with whom he had children. Luong fondled 10-year-old Meagan's breasts under her clothing, while he was helping her with her homework. He also lifted Meagan's head on another occasion while she was working on her homework, and kissed her on the lips.

On another occasion, eight-year-old Sydney dropped her pencil. As she was bending over to pick it up, Luong drew near, pulled her pants open, put his hands inside the back of her pants and touched her bottom.

T.T. attended the Center when she was nine years old. Luong kissed and touched T.T. inappropriately several times at the Center, touching her on her chest, between her legs, and on her bottom. He also kissed her on the lips while helping with her homework. He put his hand inside T.T.'s shirt, touched her on the "pointy part" of her bare chest, and then quickly removed his hand when a boy walked past the room. On other occasions at the Center, Luong touched T.T.'s "privacy" between her legs and on her bottom.

The girls did not tell their parents about what happened because they were scared. Meagan, however, did confide in her friend Julie Ann, and eventually she, Sydney, and T.T. talked about Luong's advances. Julie Ann told her mother, who called Meagan and Sydney's father, T. When Meagan and Sydney's parents found out about the abuse, they contacted T.T.'s parents and the police.

3

T., assisted by a Garden Grove police officer who spoke Vietnamese, made a covert call to Luong in October 2008. Luong initially denied touching the girls, but then fell back on an explanation that "these touching incidents might have been unintentional." When T. confronted Luong about kissing the girls on the lips, Luong explained that if he did that, it was because he kissed his children and grandchildren in the same manner.

The police arrested Luong and in late October and early November 2008, C., Meagan, Sydney, and T.T. were each interviewed by a member of the Child Abuse Services Team (CAST). The prosecution played video recordings of the CAST interviews at trial, each of the four girls testified, and Luong also testified, denying the abuse. The jury convicted Luong of lewdly touching each child in separate incidents, the trial court imposed an aggregate sentence of 12 years in prison, and Luong now appeals.

II

DISCUSSION

A.     *The Trial Court Did Not Err in Denying Luong's Mistrial Motion*

1.     Procedural Background

Luong contends the trial court erred in denying his mistrial motion after the prosecutor played for the jury T.T.'s CAST interview video that included her reference to two of Luong's other female students. T.T. did not say in mentioning the two names whether these girls had suffered any abuse. The parties had agreed before trial to redact the names of other minors besides the four victims, and the prosecutor apologized for his error in failing to omit all the names. At trial, he inadvertently distributed to the jury a transcript of T.T.'s interview that included two female names, Tanya and Jacqueline, but managed to retrieve it and replace it before the jury viewed T.T.'s interview. But the

4

prosecutor did not realize the video itself had not been corrected, and when he played it for the jury, it included the two names, which occurred at the end of the video, corresponding to the 38th page of the 42-page transcript.

The prosecutor explained to the trial court, "[T]his is my error, your honor. I apologize. I believed it had been corrected out." He had submitted the CAST video to his "tech services," "[t]hey were supposed to have edited out the names of Tanya and Jacqueline," and while he had "informed defense counsel those portions had been edited out, . . . those edits weren't actually done." The prosecutor observed, "I think it's a minor thing that went by very quickly. I don't know if the jurors caught anything other than, hey, these two names weren't in the reports . . . ."

Defense counsel complained the jury had been exposed to excluded evidence. The trial court had adopted the parties' agreed-upon redactions by delegating the matter to them before trial. Counsel argued mistrial was the appropriate remedy instead of "trying to unring that bell." According to counsel, only a mistrial would suffice because an admonishment to the jury regarding the reference would "highlight[] the problem and it just draws more attention to it."

The trial court agreed with defense counsel that "[y]ou don't want to really highlight it." But the court concluded a mistrial was not warranted. "[I]t was just two names. It was inadvertent. I don't think it changes the dynamics of what we're doing here. And, frankly, we will know if it becomes an issue for any reason because . . . . The only way it could come out as a problem we really have to deal with is if the jury says, hey, what about these other two names I thought I heard about? They're not here anymore. [¶] But I have to tell you, at the end of four interviews, they were pretty well

5

glazed over and, frankly, they were looking up and looking down. So they heard what they heard . . . ."

Specifically, T.T.'s CAST interview reference to Tanya and Jacqueline arose in the following manner. After T.T. told the interviewing social worker about an initial incident at the tutoring center in which Luong grabbed her by her wrist and touched her with his hand "somewhere on my stomach," this colloquy ensued: "[Q]: Did you ever tell anybody about the time that he was holding onto your wrist? Who'd you tell? [¶] [A]: Meagan, Sydney, *Tanya and Jacqueline*. [¶] [Q]: Okay. Did you tell them on the same day that that happened or on a different day or what? [¶] [A]: Same day. [¶] [Q]: The same day? Okay, alright. And did any of them every say, did they say that anything happened to them when you told them on that day? Hum? Okay, alright. 'Cause you had said that some, that certain things had happened to each one of the other girls? Except for not, not Julie Ann?" (Italics added.) A ringing telephone interrupted the social worker, and she did not return to her questions about whether "anything" had happened to the other girls, including Tanya and Jacqueline or, if so, whether it was similar to Luong grasping T.T.'s wrist or of a different nature.

Previously in the interview, the social worker had asked T.T. about a more explicit incident in which Luong reached inside her pants and underwear while she was sitting down and touched her "on [her] b-u-t-t," and whether anything similar had happened to friends she told about that incident. T.T. mentioned only Meagan and Sydney. Specifically, the following colloquy occurred: "[Q]: Okay, so you gave me the name of Meagan. Did you tell Meagan? Okay. Did Meagan say anything ever happened to her? You're shaking your head up and down. And then you told Sydney. Okay. Did

6

Sydney say anything ever happened to her?  [A]:  It only happened once to her.  [Q]: And Julie Ann?  [A]:  No, she's not in our tutor [group]."

> 2.      Governing Law and Analysis

We review a trial court's ruling on whether to grant a mistrial under the differential abuse of discretion standard.  (*People v. Cox* (2003) 30 Cal.4th 916, 953, overruled on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421.) "[E]xposing a jury to a defendant's prior criminality presents the possibility of prejudicing a defendant's case and rendering suspect the outcome of the trial. [Citations.]"  (*People v. Harris* (1994) 22 Cal.App.4th 1575, 1580-1581, overruled on another ground in *People v. Scott* (2011) 52 Cal.4th 452; see *People v. Thompson* (1980) 27 Cal.3d 303, 314 [cautioning that "evidence that involves crimes other than those for which a defendant is being tried has a 'highly inflammatory and prejudicial effect' on the trier of fact"].)  But "[j]uries often hear unsolicited and inadmissible comments and in order for trials to proceed without constant mistrial, it is axiomatic the prejudicial effect of these comments may be corrected by judicial admonishment; absent evidence to the contrary the error is deemed cured."  (*People v. Martin* (1983) 150 Cal.App.3d 148, 163 (*Martin*).)

Whether to admonish the jury rests in the trial court's sound discretion. (*Martin*, *supra*, 150 Cal.App.3d at p. 163.)  The trial court should grant a mistrial "only when a party's chances of receiving a fair trial have been irreparably damaged . . . ." (*People v. Bolden* (2002) 29 Cal.4th 515, 555.)  "'Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.'  [Citation.]"  (*People v. Wharton*

7

(1991) 53 Cal.3d 522, 565; *People v. Chatman* (2006) 38 Cal.4th 344, 369-370 ["Whether a particular incident is incurably prejudicial requires a nuanced, fact-based analysis"].)

The trial court did not err in declining to declare a mistrial. T.T.'s reference to Tanya and Jacqueline in the video was brief, vague, and made in the context of telling them about an incident in which Luong held her wrist, which did not suggest Tanya and Jacqueline were additional victims of Luong. (Cf. *People v. Valdez* (2004) 32 Cal.4th 73, 128 [officer's statement hinted at additional criminality in noting he interviewed defendant at "'Chino Institute,'" but "brief and isolated" remark did not require mistrial].) Just as we may not mechanically infer the jury drew the most damaging meaning from a prosecutor's statements (*People v. Frye* (1998) 18 Cal .4th 894, 970, disapproved on another ground in *People v. Doolin, supra,* 45 Cal.4th at p. 421, fn. 22), there is no reason to suppose the jury viewed T.T.'s reference to Tanya and Jacqueline in a prejudicial manner. The trial court found no prejudicial impact from the stray remark, candidly observing that by the end of the video the jury's attention had waned. We are in no position to second-guess this factual determination.

Luong argues T.T.'s reference to Tanya and Jacqueline may have tipped what he terms "a very close case" against him (bold typeface omitted), given the "length of deliberations and the request for a readback" of a detective's testimony. But "the length of a jury's deliberation is related to the amount of information presented at trial." (*People v. Houston* (2005) 130 Cal.App.4th 279, 301.) Here, after a six-day trial in which 17 witnesses testified, the jury deliberated only 10 minutes the evening they received the case, and then approximately five hours the next day. The jury did not ask any questions about Tanya or Jacqueline or T.T.'s CAST interview, but instead had

Luong's account of events in his police interview read back to them. The jury reached a verdict a half hour after convening the next morning. The case was not particularly close, given Luong's pervasive conduct in separate locales and the consistency of the testimony from victims who did not know each other. The trial court reasonably could conclude an admonition would have only highlighted the unredacted reference, and that if it had caught the jury's attention they would have asked about it. The court properly rejected Luong's mistrial motion.

B.      *The Prosecutor Did Not Commit Reversible Error or Misconduct*

Luong contends the prosecutor committed misconduct in failing to redact the two names in T.T.'s video and by referring to an English-language transcript of a covert call in Vietnamese when he cross-examined Luong. As our Supreme Court has observed, "[T]he term prosecutorial 'misconduct' is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error." (*People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1 (*Hill*), overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.) "Because we consider the effect of the prosecutor's action on the defendant, a determination of bad faith or wrongful intent by the prosecutor is not required for a finding of prosecutorial misconduct. [Citation.]" (*People v. Crew* (2003) 31 Cal.4th 822, 839.)

Under state law, prosecutorial misconduct involves "'"the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury."'" [Citations.]" (*People v. Espinoza* (1992) 3 Cal.4th 806, 820.) State law misconduct necessitates reversal where it is reasonably probable the prosecutor's behavior affected the verdict. (*Id*. at p. 820-821.) "'A prosecutor's . . . intemperate behavior violates the

federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." [Citations.]'" (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214-1215.) Such pervasive misconduct requires reversal unless it is harmless beyond a reasonable doubt. (*Hill*, *supra*, 17 Cal.4th at pp. 819, 844.)

The Attorney General argues Luong forfeited these contentions on appeal because he did not object on grounds of prosecutorial misconduct. (See *People v. Riggs* (2008) 44 Cal.4th 248, 298 [noting forfeiture generally applies ""'unless in a timely fashion — and on the same ground — the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety""'].) We reach the issue, however, because in both instances Luong challenged the prosecutor's specific conduct though he did not label it prosecutorial misconduct. Nevertheless, as noted, there was no prejudice in the prosecutor's failure to redact the isolated reference to Tanya and Jacqueline in T.T.'s video interview. Absent prejudice, there is no basis for reversal. (Cal. Const., art. VI, § 13.) Similarly, the prosecutor's reference to an English-language translation or translations of a covert call Luong received from Meagan's and Sydney's father (T.) does not require reversal.

The translation transcript issue arose when Luong admitted that during a recorded, covert call with T. he may have kissed Meagan and Sydney like they were his own children, but on cross-examination he denied telling T. it was his "nature to kiss children as though they are my own. It's a habit. Sometimes it's an accident." Holding a transcript of the telephone conversation between Luong and T. in his hand, the prosecutor had begun his cross-examination by confirming, "You had an opportunity to review this transcript before you testified; correct?" and he confirmed two or three more

10

times in his questioning that Luong "reviewed the transcripts of that call . . . before you got on the stand," but Luong steadfastly denied telling T. it was his "nature" to kiss children as his own or that it was a "habit" or "accident." Luong explained, "To me, for this translation, so many spot[s] that I disagree [with]."

When defense counsel objected to the prosecutor's references to the transcript, it emerged that the defense and prosecution each had their own translations of the call, there was no agreed-upon translation, and Luong disagreed with portions of the defense's own transcript. Neither transcript was admitted into evidence. The court acknowledged, "[W]hat I think is misleading, and the jury doesn't know about any of this, they're sitting there thinking there's one transcript out there and I wonder why I haven't heard it, if I'm guessing what jurors are doing, but really there are two, and I don't think that's been made clear to the jury." Luong requested that the trial court admonish the jury that no agreed-upon transcript existed, but the court instead simply instructed the prosecutor to "stay away" from referring to any transcript. Luong does not challenge the trial court's ruling on appeal, but instead argues the prosecutor's initial references to his transcript constituted misconduct or error and, left uncorrected, the error was prejudicial.

The prosecutor should not have referred to a transcript without first establishing that Luong had seen the same transcript, but it is not more likely Luong would have obtained a better trial outcome absent the error, nor was he deprived of a fair trial. The prosecutor referred to the transcript only a few times in his lengthy cross-examination, and Luong himself admitted he kissed his students in an affectionate manner as if they were his own.

11

Luong denied the phrasing in the prosecutor's transcript that it was in his "nature" to kiss young girls this way, or that it was a "habit" or an "accident," but these denials were consistent with his defense. Luong had explained in his testimony that he may have kissed Meagan and Sydney in a fatherly way, and he said much the same thing to the detective who interviewed him, explaining he did not often bestow kisses but "it just, it just probably just happens, you know, um, that kissing is to me like probably . . . just like timing, I don't mean anything wrong, doing anything on purpose[.]" In effect, Luong seeks reversal from the bare fact the transcript the prosecutor referred to had not been admitted into evidence, but since the transcript simply echoed other evidence instead of introducing something new and harmful, Luong suffered no prejudice. And given the prosecutor's two errors in relation to the CAST tape and the transcript were relatively minor and isolated in a lengthy trial, there was no "synergistic" due process violation requiring reversal based on pervasive or cumulative error. (*Hill*, *supra*, 17 Cal.4th at p. 847.)

### III

### DISPOSITION

The judgment is affirmed.


ARONSON, J.

WE CONCUR:


MOORE, ACTING P. J.


FYBEL, J.

12