Filed 12/8/20  P. v. Shumate CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>BRANDEN EDWARD SHUMATE,<br><br>    Defendant and Appellant. | G056263<br><br>(Super. Ct. No. 12HF2093)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Lance Jensen, Judge.  Affirmed.

Fay Arfa for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Annie Featherman Fraser, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury convicted Branden Edward Shumate of three counts of lewd acts against a child under the age of 14 (Pen. Code, § 288, subd. (a)),[1] and found true the penalty enhancement allegation that Shumate committed the crimes against more than one victim (§ 667.61, subds. (b), (e)(4)).  The charges were brought against Shumate in July 2012, he was convicted in February 2016, and in April 2018 the trial court sentenced him to a term of 45 years to life in prison.  Shumate raises several contentions regarding his legal representation at trial and at sentencing.  Those issues include whether the trial court properly granted his third retained attorney's request to be relieved as counsel before trial and whether the court later properly denied his request, prior to sentencing, to replace his appointed counsel with a retained attorney.

Shumate also raises a host of other contentions.  He challenges the sufficiency of the evidence to support the jury's conclusion one of his victims was less than 14 years old; he challenges a jury instruction (CALCRIM No. 207); and he contends the court improperly admitted transcripts of a covert phone calls and erred in admitting evidence of the victims' fresh complaints against him.  At his request, we review the trial court's in camera handling of his *Pitchess* motion, and we assess his claim that his sentence is so disproportional to his culpability that it violates constitutional norms.  None of Shumate's contentions has merit.  We therefore affirm the judgment.

### FACTUAL BACKGROUND

We set out the relevant factual background concerning Shumate's offenses against each victim, and then in our discussion we review the procedural background pertaining to his respective claims, as necessary.

_____

[1]     All further statutory references are to the Penal Code, unless otherwise specified.

2

- *Doe 1*

When Doe 1 was six or seven years old, her mother dropped her off at the church in Lake Forest where Shumate's father was a pastor.[2] Shumate, a young adult at the time, was going to take Doe to a water park with his cousins, who were near the same age as Doe. Doe and her mother had developed a close relationship with the Shumate family. Doe thought of Shumate's parents as her aunt and uncle, and of Shumate as an older cousin. She sometimes stayed at the Shumate home on weekends.

On the day Doe was dropped off at church, Shumate's cousins never showed up. She fell asleep on a futon in a back room where musical instruments were stored. She wore her bathing suit with a shirt over it, and either shorts or a skirt-type pair of shorts.

Doe woke up to Shumate's fingers inside of her vagina. She "froze" and pretended to be asleep. It was uncomfortable and she was frightened. Shumate stopped, and after a few minutes, she pretended to wake up. Shumate questioned whether she had really been sleeping, and she said she was. A short time later, they went to an Arby's to get lunch. Doe's mother picked her up a few hours later. Thereafter, the families continued to spend time together, but Doe tried to avoid being alone with Shumate.

When she was 12 or 13 years old in "2003/2004," Doe and her mother and stepfather moved from Dana Point to San Juan Capistrano. They rented a truck and several family friends, including a man named Mike Fielder, helped load it up. Doe knew Fielder and was comfortable around him. Doe's home in Dana Point was in the same condominium complex where Shumate's parents lived. Toward the end of the move, Shumate and his father stopped by the Does' new residence. Shumate's father left, but Shumate stayed to help return the rental truck.

---

[2] For ease of reference, we refer to Doe 1 as Doe in this section, until reaching the facts concerning Doe 2.

Later that night, Fielder drove the rental truck to return it in Santa Ana, while Shumate and Doe followed behind him in another car. Doe testified she "didn't think that anything bad could happen" because "I was older," but, after following Fielder for awhile, Shumate turned off the freeway and parked in a dark industrial area. He took her cell phone from where it rested on the seat beside her and moved it to the side pocket of the driver's side door. He unbuttoned his pants, removed his penis, and made Doe orally copulate him, while she attempted to resist.

Meanwhile, Fielder arrived at the truck rental location and realized Shumate was no longer behind him, though Shumate had followed him to a gas station near the rental facility. Fielder's numerous calls to Doe's cell phone went unanswered. As Doe's phone continued to ring, Shumate lost his erection. Shumate then unbuttoned Doe's pants and digitally penetrated her. Doe was upset and crying.

Shumate and Doe arrived at the rental location about an hour after Fielder. The drive from where they had been parked to the rental facility was just "a couple of minutes," according to Doe. On the way there, Shumate told Doe to "calm down and act normal." When Fielder asked why Doe had not answered her phone, she told him she had not heard it ring. Shumate told Fielder they had gotten lost and gone to a different rental location, despite Fielder's directions.

On the return drive, Doe sat in the back seat while Fielder sat in the front with Shumate. Fielder testified that Doe, who was usually bubbly and "hyper," sat in a corner and was uncharacteristically silent. They dropped Shumate off at his father's home in Dana Point.

Several years later, when Doe was 17 years old, she moved in with her brother and his girlfriend. Doe became close with the girlfriend and confided in her about Shumate's abuse. The girlfriend was a receptionist for several lawyers, including Kevin McGuire, a personal injury attorney. Doe heeded the girlfriend's advice to tell

4

McGuire what had happened; he advised her to contact the police. McGuire went with Doe to the sheriff's department in Riverside to report the abuse in September 2009.

In October 2009, when she was 18 years old, Doe made covert calls to Shumate from the Orange County Sheriff's Department. The covert calls were played for the jury. During one call, without prompting, Shumate admitted he felt "bad in a way" because it "[s]eems like I did some stuff that I shouldn't have done." When Doe pretended she was puzzled, he said, "you know pretty obvious." Doe asked whether he was talking about "what happened" in the car, "me sucking your dick?" and he responded, "Kind of yeah."

- *Doe 2*

When she was around six years old in 2006, Doe 2's family lived in Hawaii, where they met Shumate, his wife, and his two young daughters. The two families became close, spent weekends and holidays together, and Doe 2 and her brothers referred to Shumate as "Uncle Branden."

In 2009, Doe 2's family moved to the Central Valley in California, her parents separated, and her father moved to Alaska. In July of that year, Shumate and his family visited and stayed with Doe 2's family. Doe 2 remembered later that he spoke to her about sex during the visit. Shortly thereafter the Shumates moved to Dana Point and, in December 2010, Doe 2's mother moved into the Shumate's apartment with her children.

Shumate often took the children to the community pool while the mothers went to the gym. On one of those nights, Doe 2 was alone in the bathroom wearing a towel. Shumate entered, sat Doe 2 down on the toilet, and spread her legs open. He touched her vagina with his tongue. He told her not to tell anyone or she would get in trouble.

Her mother noticed that while living with the Shumates, Doe 2's demeanor changed; she became angry, upset, and temperamental. On one occasion in late January

5

or early February, Doe 2 refused to enter the apartment, screaming that she would not go back in. Living in the home became chaotic and tense, exacerbated by Shumate's insistence that the families do all their activities together. In March 2011, Doe 2's mother moved with her children to Alaska, where her parents lived.

Doe 2's mother noticed Doe 2 exhibiting sexualized behavior. Doe 2 spent some time in an in-patient facility to address her aggression and anger. Doe 2's mother had been raped and molested by an uncle at a young age. She explained this to Doe 2, and asked if anyone had touched her; Doe 2 initially denied it. Then Doe 2 disclosed that "Uncle Branden" touched her on her vagina. When her mother asked what he had used to touch her, she pointed to her mouth.

Her mother immediately called the Anchorage Police Department, and in an interview a few weeks later, Doe 2 told detectives that Shumate gave her a "secret touch." She explained how it happened in the bathroom and that Shumate threatened she would get in trouble if she told anyone.

In March 2012, Doe 2's mother made a series of covert calls to Shumate from the Anchorage Police Department.[3] The calls were played for the jury. During the calls, mother exaggerated Doe 2's condition, telling Shumate that Doe 2 had been "in and out" of a hospital for six months, and she falsely claimed Doe 2 was suicidal and medicated. She also said she found a journal in which Doe 2 wrote down what Shumate had done to her. Shumate denied committing any abuse.

Doe 2's mother emphasized her daughter needed his apology so she could begin to heal, but Shumate accused mother of trying to set him up and "get him busted." Nevertheless, he admitted: "[I]f that is really in her journal then I'm already toast, I'm already fuckin' going' to jail man, and that, that's exactly what's gonna happen then."

---

[3] For ease of reference throughout this section and in the discussion section below, we occasionally refer to Doe 2's mother simply as "mother."

Shumate asked if the call was being recorded, had mother swear "on a Bible" that it was not, and wanted assurance that she was alone. He pleaded, "You're not gonna let them do anything to me," and mother said no. He then told her he would tell her what had happened.

Shumate claimed Doe 2 and his daughters were in the bathtub together, and he moved in and out of the bathroom getting things ready, including handing Doe 2 a towel. When Doe 2 was on the toilet drying herself off, he admitted he bent down on his knee, "kissed the inside of her leg," then stood up quickly and immediately apologized. He denied putting his tongue on Doe 2's body, stating it had all happened very quickly. When mother asked if Shumate licked Doe 2's vagina, Shumate admitted he had and said, "God yes, I'm sorry." He said it had been spontaneous and only happened that one time.

## DISCUSSION

1.  *Right to Counsel*

Shumate raises several issues regarding his right to counsel. The first issue is whether before trial the court properly relieved the third private attorney Shumate hired to represent him after counsel advised the court that an irreparable conflict had arisen with Shumate. The second issue is whether, more than two years after his conviction, the trial court properly denied Shumate's request to substitute another newly hired attorney for his appointed counsel. The third issue is whether, in conducting a progress hearing two weeks before the scheduled sentencing hearing, at which the prosecutor waived her appearance, the trial court violated Shumate's right to be present. Related to this issue is whether his appointed attorney rendered ineffective assistance of counsel by proceeding with the progress hearing in his absence. Before turning to these issues, and to put them into their proper context, we briefly set out Shumate's history of being represented by

7

retained counsel, self-representation, and appointed counsel over the nearly six years that elapsed between the filing of the complaint in July 2012 and his sentencing in April 2018.

A.     *Background Proceedings Related to Right to Counsel*

On July 20, 2012, the prosecutor filed the complaint alleging Shumate committed three counts of lewd acts against the two Doe victims.  His arraignment was continued several times, including on November 9, 2012, after which he retained private counsel, James Sweeney.  Shumate was subsequently arraigned on November 16, 2012, and pleaded not guilty to the complaint.  In December 2012, Shumate retained new private counsel, Jeremy Goldman, who substituted in for Sweeney.

In June 2013, almost a year after charges had been filed, and after numerous court appearances, the court granted Shumate's request to relieve Goldman, and appointed the Public Defender's office to represent him.  The next month, in July 2013, Shumate filed a *Marsden* motion to replace his appointed counsel, which the court denied.  (*People v. Marsden* (1970) 2 Cal.3d 118.)  Shumate indicated he thought he wanted to represent himself, but sought an opportunity to consult with family members before making that decision; in response the court continued the matter.

In October 2013, after both sides answered ready for the preliminary hearing, Shumate made another *Marsden* motion, which the court denied after a hearing. Shumate then moved to represent himself; the court continued the preliminary hearing to hold a *Faretta* hearing.  (*Faretta v. California* (1975) 422 U.S. 806.)  The day of that hearing, Shumate appeared with retained counsel, Louis Pilato, who substituted in as Shumate's attorney as of that date, October 29, 2013.

Nearly nine months later—two years after the filing of the complaint—on July 24, 2014, after numerous continuances and court appearances, the court conducted the preliminary hearing, and Shumate was held to answer.   In August 2014, Shumate pleaded not guilty to the counts alleged in the information and trial was set for

8

September 29, 2014. After another series of continuances, that trial finally commenced in January 2016.

Prior to trial, in September 2014, Shumate's retained counsel, Pilato, filed a motion to dismiss the information. (§ 995.) At the hearing on that motion in October 2014, Shumate interrupted the court to state that he was filing a claim of "ineffective assistance of counsel at [the] preliminary hearing." The court directed Shumate to speak to his attorney to make his legal arguments, which Shumate refused to do, suggesting he was entitled to something akin to a *Marsden* hearing. The court explained that the *Marsden* procedure only applied to appointed counsel but that the court would appoint counsel if Shumate could not afford an attorney. The court also advised Shumate that, if it would not disrupt the orderly administration of justice, Shumate could change retained attorneys by filing a substitution motion.

Shumate again interrupted the proceedings on the section 995 motion, asking to speak to his father about retaining new counsel, which the court explained was not timely in the middle of the hearing. Shumate then consulted with his attorney, who proceeded to argue for dismissal of the charges under section 995. The court denied that motion.

A few days later, in early October 2014, Pilato filed a motion to continue the trial because he was engaged in another trial in Long Beach. Pilato also indicated at the hearing on the motion that a conflict might exist regarding his continued representation. Shumate had told him "this morning" that he had a motion he wanted to file and had tried to do so to assert ineffective assistance of counsel against Pilato. Apparently, the court clerks had not accepted the motion for filing. The court confirmed it would not accept written motions from a defendant represented by counsel.

After interjections by Shumate, the court recessed, and directed the bailiff to remove Shumate from the courtroom. While Shumate remained in a holding cell, the court later recalled the case, explaining that Shumate was "not obeying the court or

9

adhering to what the court was telling him which [was that] I wasn't going to entertain any motions or comments from him that did not go through counsel." The court apparently granted Pilato's requested continuance because the next date in the record is the October 15, 2014 trial date.

On the trial date, the court granted Pilato's request to withdraw as Shumate's attorney on grounds that an irreparable conflict had arisen between client and attorney. The court continued the case to the following day so Shumate could decide whether he would retain counsel or seek appointed counsel.

At the hearing on October 16, Shumate objected to appointed counsel from the Public Defender's Office on grounds of conflict, presumably based on his dissatisfaction with having been previously represented by the office; the court then appointed the Alternate Public Defender's Office. Shumate objected, stating he wanted to represent himself; the matter was trailed to the next day. The next day, Shumate affirmed he wanted to represent himself, and the court granted his request.

On October 24, 2014, Shumate requested and was granted an investigator. Days later, Shumate sought to relieve the investigator and replace him. The court conducted what it referred to as a "quasi-*Marsden*" hearing on Shumate's request, which the court learned was based on Shumate's desire to have the state pay for a privately-retained investigator. The court denied the request.

On the rescheduled trial date, December 1, 2014, Shumate requested and was granted a continuance to March 11, 2015. In January 2015, Shumate again sought to have his investigator relieved and another one appointed, which the court denied. On January 30, 2015, Shumate retained a private investigator; the court then relieved the appointed investigator. Shumate requested that the trial date be continued, which the court granted, resetting it for May 11, 2015.

When the May trial date arrived, the court granted Shumate's request to substitute in Jovan Blacknell as his retained counsel. The court denied Shumate's request

10

that Shumate be considered his own cocounsel. The trial court set another trial date in August 2015, which was subsequently continued, with Blacknell remaining as Shumate's retained counsel.

Shumate's trial finally began on January 19, 2016, three and a half years after the complaint was filed. Shumate was convicted on all three counts on February 8, 2016. The sentencing hearing was initially set for March 25, 2016. Shumate was not actually sentenced until April 27, 2018, more than two years after his conviction.

B.      *Relieving Pilato as Trial Counsel*

Shumate contends the trial court erred in granting Pilato's request to be relieved as his attorney in October 2014. We find no error.

Shumate casts his claim as one impacting his constitutional right to the assistance of counsel, including retained counsel of his choice and the right to waive a conflict of interest involving the attorney. Under the Sixth Amendment to the United States Constitution, a defendant has the right to select and pay for legal representation of his or her choosing, with few restrictions. (*Powell v. Alabama* (1932) 287 U.S. 45, 53.) Our high court has similarly held under the state analogue (Cal. Const., art. I, § 15) that a defendant's right to retain chosen counsel "can constitutionally be forced to yield only when it will result in significant prejudice to the defendant himself or in a disruption of the orderly processes of justice unreasonable under the circumstances of the particular case." (*People v. Crovedi* (1966) 65 Cal.2d 199, 208 (*Crovedi*).)

Shumate asserts that "'"California makes a defendant the master of his fate and allows him to proceed uninterrupted, with the exceptions of flagrant circumstances of attorney misconduct or incompetence [citation], with counsel of his choice if the parties involved in the conflict properly waive any potential or actual conflicts."'" (Quoting *People v. Jones* (2004) 33 Cal.4th 234, 252.) In advancing this position, Shumate understates the fact that the attorney properly plays a role in determining whether there is a conflict that results in a breakdown of the client-attorney relationship.

11

That relationship is crucial to effective representation. "'[T]he attorney-client relationship . . . involves not just the casual assistance of a member of the bar, but an intimate process of consultation and planning which culminates in a state of trust and confidence between the client and his attorney. This is particularly essential, of course, when the attorney is defending the client's life or liberty.'" (*People v. Ortiz* (1990) 51 Cal.3d 975, 983.)

Granting or denying an attorney's request to withdraw from representing a client, including in a criminal matter, rests within the trial court's sound discretion. (E.g., *People v. Cohen* (1976) 59 Cal.App.3d 241, 249 (*Cohen*).) An "apparent total breakdown in the relationship between [the] defendant and her [or his] attorney provide[s] adequate grounds for the trial court to relieve that attorney." (*Ibid.*)

The trial court here found that "a conflict of interest does exist and [to] allow this case to proceed with current counsel would, in the court's opinion, result in defendant getting [a] trial [tainted] with ineffectiveness of counsel." While the court phrased its ruling in terms of "a conflict of interest," it is apparent to us that this was not the sort of conflict Shumate could waive, such as one involving a conflict between his interests and those of another client or former client of Pilato's. (See, e.g., *People v. Mroczko* (1983) 35 Cal.3d 86, 112.)

Instead, this conflict arose out of Pilato and Shumate's attorney-client relationship. Pilato explained to the court that his reasons for seeking to withdraw included (1) Shumate's repeated allegations, evident in outbursts before the court, that Pilato provided ineffective assistance of counsel; (2) Shumate's belief that Pilato was working with the District Attorney's Office against Shumate's interests, a belief apparently encouraged by Shumate's father; and (3) Shumate's stated belief that Pilato was conspiring with the trial court to violate his rights. Pilato also told the court that there were other conflicts he could not divulge because they involved confidential communications. Pilato told the court, "[W]e have reached the point of a definite and

12

irreparable conflict of interest where there is no active relationship that could go on between the individual and myself."

While Shumate expressed surprise at the alleged breakdown in relations, stating to the court that it was "the first [he had] heard of" it, the court "was not required to accept defendant's version of the events." (*Cohen*, *supra*, 59 Cal.App.3d at p. 249.) "[C]ounsel 'is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop.'" (*Leversen v. Superior Court* (1983) 34 Cal.3d 530, 537; accord, *Holloway v. Arkansas* (1978) 435 U.S. 475, 485-486.) Shumate has shown no abuse of discretion in the court allowing Pilato to withdraw.

In any event, we fail to see how any possible error in the decision was prejudicial. The trial did not take place for nearly another year and a half, affording Shumate ample time to secure other representation with whom he could build a better working relationship. He retained other private counsel at least twice over the next four years before he was sentenced. Shumate's primary objection to Pilato being discharged seems to have been his repeated insistence that Pilato's representation was "paid in full" through trial. But a criminal courtroom is no place to litigate private, contractual fee relationships when the client and attorney cannot maintain a working relationship through the proceedings that are underway. Shumate cites no authority that the criminal court is the guarantor of any fee arrangement with retained counsel, nor that it is responsible for adjustments or declarations of breach on one side or the other, and we are not aware of any such precedent.

For all these reasons, Shumate's challenge to Pilato's discharge as grounds to reverse his eventual criminal conviction under different representation has no merit.

C. *New Counsel for Sentencing Hearing*

Shumate contends the trial court violated his right to retained counsel by denying his request—two years after he had been convicted—to substitute new private counsel for appointed counsel before his sentencing hearing. "[W]e apply an abuse of

13

discretion standard of review to a trial court's denial of a motion to relieve [or substitute] retained counsel." (*People v. Dowdell* (2014) 227 Cal.App.4th 1388, 1411 (*Dowdell*).) Because our review turns on the circumstances before the court "at the time [of] the request" (*Crovedi*, *supra*, 65 Cal.2d at p. 207), we briefly set out the relevant background.

i.      *Postconviction Proceedings*

Following Shumate's conviction in February 2016, his sentencing hearing was set for the end of March 2016, then continued into May and again into June of 2016, and then to September 30, 2016.  All of the continuances were at Shumate's request.  In September, Shumate commenced efforts to relieve Blacknell, his retained trial attorney, by filing papers on his own behalf stating a conflict had arisen.  Then, after sentencing was again continued into October 2016 because Blacknell was engaged in a trial, Blacknell filed a motion to be relieved as counsel.

On October 28, 2016, the rescheduled sentencing date, the trial court relieved Blacknell and appointed first the Public Defender to represent Shumate, and then the Alternate Defender after the Public Defender declared a conflict.  Further hearings were then set for December 2, 2016; that hearing was later continued to June 16, 2017 at Shumate's request.

On the June 16, 2017 hearing date, Shumate moved to relieve the entire Alternate Defender's Office.  The court held a *Marsden* hearing and denied Shumate's request.   Thereafter, a hearing on a new trial motion Shumate intended to file was set for November 13, 2017.  Shumate had appeared at an August sentencing hearing with a new attorney from the Alternate Defender's Office, Heather Moorhead.  The court continued the August sentencing hearing to coincide with the November 13 new trial motion date.

On November 13, a newly retained attorney, Cory Parker, appeared and requested to substitute in as Shumate's counsel.  The court granted the request after confirming that Parker had been retained and paid.  Shumate then began to interrupt the

14

proceedings with screaming outbursts; he was removed from the courtroom when he did not heed the court's admonishments.

After a break, Shumate returned to the courtroom which allowed the court to obtain a time waiver to a new sentencing date on January 22, 2018. Shumate apparently had not previously met Parker, and during an exchange with the court, Parker indicated that Shumate was not listening. The court then recessed to allow Shumate and Parker to discuss the case, trailing the hearing to the afternoon; before the recess, Shumate again became disruptive.

Upon his return in the afternoon, Shumate continued to disrupt the proceedings. When the court tried to take Shumate's time waiver for the continuance, he and Parker stated they agreed Parker would no longer represent him. The court relieved Parker and reappointed the Alternate Defender.

At the same November 13, 2017 hearing, the court set a progress review hearing—which would enable it to monitor counsel's progress on the new trial motion—for early January, to precede the January 22, 2018 sentencing date. The court advised counsel that "should she need assistance getting the materials she requires for the motion," she should notify the court. Shumate requested a *Marsden* hearing to obtain new appointed counsel, which the court heard and denied. The court then accepted Shumate's time waiver.

At the progress review hearing on January 11, 2018, the prosecutor waived her appearance and Shumate also did not appear initially, remaining in a holding cell outside the courtroom. The court inquired regarding defense counsel's progress in preparing for the upcoming hearings, including whether she had been able to obtain transcripts and other materials. She affirmed she had, though it had been difficult given the number of attorneys preceding her on the case. A court reporter transcribed the discussion which the court conducted in chambers.

15

Following this colloquy, the court proceeded with the progress hearing in open court, where Shumate appeared and requested to substitute new retained counsel, who was present. The court reviewed the history of the proceedings, including numerous continuances "since 2016 and that i[t] is now almost 2 years since the defendant was found guilty."

Shumate stated he wanted "new counsel for several reasons," which he stated included his fear—which he did not explain—"that he may suffer retaliation at the jail, that he does not trust the alternate defenders office and that his new attorney is experienced[,] with a great reputation."

The court found the substitution request untimely, and that granting it "would be a disruption to the orderly progress of this matter." Balancing Shumate's interest in new retained counsel "against the disruption this request would cause," the court denied the motion, finding that it "would result in a[n] undue delay of these proceedings." As a result, the court declined to hear from Shumate's potential new counsel, who was present (and who represents him before this court). During oral argument, counsel described this hearing as "brutal" and "extremely unfair."

ii.    *Applicable Law & Analysis*

A defendant's right to due process and to effective assistance of counsel includes the right to retain counsel to defend against criminal charges. (*People v. Courts* (1985) 37 Cal.3d 784, 789.) But those rights are not absolute. "'[T]he "fair opportunity" to secure counsel of choice provided by the Sixth Amendment "is necessarily [limited by] the countervailing state interest against which the [S]ixth [A]mendment right provides explicit protection: the interest in proceeding with prosecutions on an orderly and expeditious basis, taking into account the practical difficulties of 'assembling the witnesses, lawyers, and jurors at the same place at the same time.'"' [Citation.]" (*People v. Keshishian* (2008) 162 Cal.App.4th 425, 428 (*Keshishian*).)

16

These same concerns apply to sentencing, including victims' rights to "expeditious enforcement" of the law and "a prompt and final conclusion of the case." (Cal. Const., art. I, § 28, subd. (a)(2), (b)(9).) "'"The right to counsel cannot mean that a defendant may continually delay his day of judgment by discharging prior counsel."'" (*Keshishian*, *supra*, 162 Cal.App.4th at p. 429.) Thus: "A court faced with a request to substitute retained counsel must balance the defendant's interest in new counsel against the disruption, if any, flowing from the substitution. [Citations.]" (*People v. Lara* (2001) 86 Cal.App.4th 139, 153.)

The defendant bears the burden to establish an abuse of discretion in the trial court's ruling. (*Dowdell*, *supra*, 227 Cal.App.4th at p. 1411.) If the defendant meets his burden, the erroneous deprivation of chosen counsel is structural error. (*United States v. Gonzalez-Lopez* (2006) 548 U.S. 140, 149-150; *People v. Ortiz* (1990) 51 Cal.3d 975, 988.) Like the trial court, we must consider "the totality of the circumstances." (*People v. Maciel* (2013) 57 Cal.4th 482, 513.)

During the two years between Shumate's conviction and his sentencing, the trial court made repeated and diligent efforts to ensure Shumate had the assistance of retained or appointed counsel. The court extended the sentencing hearing for six months from March 2016 to September 2016 so that Shumate could work with his retained trial counsel to potentially file a new trial motion and to prepare for sentencing. When Shumate proved unable to work with Blacknell, the court gave Shumate three months to work with his initial deputy alternate defender, and then another six months, only to see Shumate file a *Marsden* petition in June 2017. The court denied the *Marsden* petition, one of many that followed, because it found he was receiving effective representation.

Another five months passed as the court repeatedly granted Shumate further continuances, only to have him appear at the November 13, 2017 hearing seeking to substitute newly retained counsel. The court observed at that time, and we agree, that the matter had already been so long delayed that the court would have been within its

17

discretion to deny the substitution motion.  Nevertheless, it granted the motion, only to see Shumate unable to develop a working relationship with his new counsel for even one day.  The court's minutes predating this period also showed that Shumate's habit of changing horses—or at least jockeys—in midstream was disrupting the proceedings because each new attorney had to obtain already lengthy transcripts, documents, and other materials piecemeal from Shumate and from multiple prior counsel.

Two more months passed after Shumate's aborted engagement of Parker in November 2017.  Shumate demonstrated he had the means, with family assistance, to hire private counsel, but when that relationship failed—marked by Shumate's disruptive courtroom outbursts and inability to work with his counsel of choice—he gave the trial court no assurance he would seek to retain replacement counsel.  On this basis alone, where Shumate fails to demonstrate any reasonable diligence in obtaining substitute counsel before January 2018, the trial court's ruling was correct.  The defendant may not "abuse the patience of the court through dilatory efforts to seek counsel." (*Crovedi*, *supra*, 65 Cal.2d at p. 208.)

Shumate argues that the court erred in failing to inquire whether the attorney who appeared with him in January would need a continuance.  But some questions need not be asked.  Shumate already had established a pattern that was the antithesis of timeliness and diligence.  Each change of counsel was followed by a period of months, and sometimes more than a year, before Shumate would again seek to replace counsel.  Alternate defender Moorhead indicated during her meeting with the court that she would need an additional two months to prepare the case and, indeed, the sentencing hearing was tentatively continued to April 2018.  The trial court could reasonably conclude this delay would only have been longer—and likely much longer—with the substitution of another new lawyer.  With two years already having elapsed, the court reasonably concluded Shumate's request was "'not timely'" and would "'result in

18

"disruption of the orderly processes of justice."'" (*People v. Verdugo* (2010) 50 Cal.4th 263, 311.) There was no abuse of discretion in denying the substitution request.

D.       *Court Colloquy in Shumate's Absence*

Shumate argues the court's colloquy with his appointed counsel in his absence at the progress hearing violated his right to be present for the proceedings. In the alternative, he argues that his attorney rendered ineffective assistance of counsel by permitting the in chambers discussion to occur without him. Neither claim warrants reversal.

A criminal defendant has the right to be present at his trial under the Sixth and Fourteenth Amendments to the federal Constitution and under article I, section 15, of the California Constitution. (*People v. Howze* (2001) 85 Cal.App.4th 1380, 1393.) The Penal Code also specifies that right. (*Ibid.*; §§ 977, 1043.) The right to be personally present, however, does not extend to every court proceeding that takes place. (*People v. Cole* (2004) 33 Cal.4th 1158, 1231.)

Under the Sixth Amendment's confrontation clause, a criminal "'defendant does not have a right to be personally present at a particular proceeding unless his appearance is necessary to prevent "interference with [his] opportunity for effective cross-examination." [Citation.]'" (*People v. Cole*, *supra*, at p. 1231.) "'Similarly, under the Fourteenth Amendment's due process clause, a criminal defendant does not have a right to be present at a particular proceeding unless he finds himself at a "stage . . . that is critical to [the] outcome" and "his presence would contribute to the fairness of the procedure."' [Citations]." (*Ibid.*)

Under article I, section 15, of the California Constitution, a defendant has a "right to be personally present at critical proceedings," but does not have a right "to be present at discussions on questions of law outside the jury's presence or at proceedings where the defendant's presence does not have a reasonably substantial relation to the

19

fullness of his opportunity to defend against the charge." (*People v. Perez* (2018) 4 Cal.5th 421, 438 (*Perez*), internal quotations & citations omitted.)

If a defendant should have been present, but was not, his absence does not require per se reversal; it is not structural error. (*Perez, supra*, 4 Cal.5th at p. 438.) The defendant bears the burden to establish his absence prejudiced his defense or denied him a fair trial. (*People v. Jennings* (2010) 50 Cal.4th 616, 682.) Similarly, to prevail on a claim for ineffective assistance of counsel, the defendant must demonstrate prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688.) The reviewing court need not delve into whether the attorney's performance was deficient if the defendant fails to demonstrate prejudice. (*Id.* at p. 687.)

All of these rules are applicable here. Shumate shows no prejudice stemming from his absence at the beginning of the progress review hearing, a meeting that the clerk's transcript reflects was less than 15 minutes. Shumate requested and was granted a copy of the sealed reporter's transcript of the discussion and he does not argue he was prejudiced, nor do we discern any prejudice. The court and counsel reviewed counsel's progress in obtaining and reviewing the lengthy record and materials from past counsel, and counsel's progress in preparing for the hearing. As the court had previously observed, retrieving and reviewing the growing body of documents was a challenge. As evidenced by the reporter's transcript, nothing the court or counsel discussed was anything that they could not have discussed in open court. There was no prejudice and no error.

2.      *Sufficiency of the Evidence*

Shumate challenges the sufficiency of the evidence to support the jury's conclusion Doe 1 was under 14 years old the second time he committed lewd acts against her, as required for count 2. (§ 288, subd. (a).) The evidence supports the jury's verdict.

"'A reviewing court faced with . . . a claim [of insufficient evidence] determines "whether, after viewing the evidence in the light most favorable to the

20

prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citations.] We examine the record to determine "whether it shows evidence that is reasonable, credible and of solid value from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.] Further, "the appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." [Citation.]'" (*People v. Crabtree* (2009) 169 Cal.App.4th 1293, 1321-1322.)

Ample evidence showed Doe 1 was 13 years old or younger when Shumate abused her after driving her to a dark parking lot. She testified she was in seventh grade and 12 or 13 years old when it occurred. Her testimony alone suffices. "In cases of sex crimes committed on children, the age of the child may be established by the child's own testimony." (*People v. Crownover* (1939) 34 Cal.App.2d 7, 9.) The jury was properly instructed it could credit the testimony of a single witness to support any factual finding. (CALCRIM No. 301; *People v. Leigh* (1985) 168 Cal.App.3d 217, 221.) Fielder also testified that Doe 1 was 12 or 13 years old at "the time of the move" during which the incident occurred, and attorney McGuire testified Doe 1 told him it happened when she was "approximately 12 years of age."

Shumate relies on the fact that Doe 1 did not remember exactly how old she was, nor did she "articulate a date" that placed her under the age of 14. No such specificity is required; it is enough that she had not yet turned 14. (§ 288, subd. (a).) Shumate reasons that when she told the prosecutor that she was "approximately" 13 years old at the time of the alleged incident, but could not recall the month, it might have occurred on or after her 14th birthday. Not so. Born in 1991, her 14th birthday would have been in 2005, but she testified the abuse was in "2003/2004." There is no merit to Shumate's challenge to the sufficiency of the evidence.

21

### 3. *CALCRIM No. 207*

In a related claim, Shumate contends the trial court erred in giving the jury an instruction based on CALCRIM No. 207, and that his counsel was deficient for failing to object to the instruction. The title of the instruction stated its purpose, namely, that the "Proof Need Not Show Actual Date" that the alleged offenses were committed. The instruction told the jury that the crime alleged in count 2 occurred within a two year period "on or about and between" two specific dates. Those dates were Doe 1's 12th birthday and the day before her 14th birthday. Thus, the date range was from when she turned 12 years old to when she had not yet turned 14, which was one day later. Doe 1 gave the jury her birthdate in her testimony, including the specific day and month.

Shumate asserts that by giving the jury a date range in this "on or about" manner, the trial court's instruction was erroneous because it did not require the jury to conclude the offense happened on or before the last day specified, which was the day before she turned 14. Instead, it might have been simply near or "about" that date, including afterwards. If committed on or after her 14th birthday, the age element of the offense would not have been satisfied. (§ 288, subd. (a).) She contends the prosecutor exacerbated the problem by arguing, as to the date of the offense: "If you think it was in 2002 or you think it was in 2005, that's okay. That doesn't mean the end of your investigation or your inquiry. It just means it has to be within a reasonable period of time of the time indicated for you."

Although counsel did not object to the instruction, we reach Shumate's contention on appeal because defendants in a criminal trial are entitled to jury instructions that correctly state the law—a "substantial right" (§ 1259) that he claims was violated here. (*People v. Palmer* (2005) 133 Cal.App.4th 1141, 1156.)

Shumate's claim fails because we must read the instructions as a whole, just as the jurors are instructed to read them. (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 276.) CALCRIM No. 200 instructed the jury they must "[p]ay careful attention to

22

all of these instructions and consider them together." The trial court also instructed the jury with CALCRIM No. 1110, which specified that the prosecution had to prove for each of the lewd act counts, including count 2, that "[t]he child was *under the age of 14 years at the time of the act*." (Italics added.)

Read together with the other instructions, this meant that "reasonably close" to the end date specified in CALCRIM No. 207, as the prosecutor argued, had to have been before that date, not after. In other words, count 2 had to have been committed before Doe 1 turned 14, which would not include her fourteenth birthday. We presume jurors "are intelligent persons capable of understanding and correlating jury instructions." (*People v. Martin* (1983) 150 Cal.App.3d 148, 158.) Moreover, in light of the evidence placing the offense during "the time of the move" and that it occurred when she was 12 or 13 years old in "2003/2004," and thus well before her September birthday in 2005, any conceivable error in CALCRIM No. 207 as given to the jury was harmless. Shumate's instructional challenge therefore fails.

4.     *Covert Calls*

Shumate argues the trial court erred by allowing Doe 2's mother to "authenticate" as "accurate" transcripts of recordings of covert calls she made with him, and he asserts the court further erred by admitting the transcripts as exhibits. We find no error in the trial court's ruling based on Shumate's limited objection to the transcripts, which the court addressed with a jury instruction, as we discuss below.

The issue arose as follows. At trial, the prosecutor asked Doe 2's mother why she had initialed one of the transcripts "in the upper corner there," and she responded, without objection, that "[i]n listening to the audio recording [of her recorded conversation with Shumate], I followed through with this [notation] to note that everything that I'm seeing [on the transcript] is what was being said there." She similarly testified that she initialed another transcript of calls "as [an] indication [she] reviewed

23

this [CD] track, along with this transcript, [and that] other than some typographical errors, things of that nature," it was "an accurate transcript."

Likewise, after the prosecutor played "the third portion and th[e] fourth portion" of mother's recorded conversation with Shumate, he asked her whether, in "following along with the transcripts that have been provided to you, again, are they a complete and accurate depiction of your telephone conversation with the defendant in this case back . . . in March of 2011?" She answered, "Yes."

When the prosecutor reviewed Shumate's conversation with Doe 2's mother, Shumate did not contend that the transcript of the colloquy in which he admitted he licked Doe 2's vagina or, "Very close to it," was inaccurate. Instead, he testified he did not touch Doe 2 on her vagina or near it, and only answered mother as he did because he "feared" her. When the prosecutor asked, "[H]ow [does] telling her that you did something like this to her daughter help you get over that fear," he answered, "Because she said that she wasn't going to report me, she was not going to turn in [Doe 2's] journal, and that her child wouldn't be medicated if I did." He feared that mother would "send out e-mails to a lot of the professionals that I knew and had good relationships with for many years."

Shumate implied he would suffer undeserved consequences unless he gave mother the admission she wanted, given that he knew "who [mother] is and what she's capable of." In this context, he did not view his answers in the transcript as admissions of guilt. To the contrary, when asked what he wanted to tell the jury about the alleged touches, he testified, "I can tell them that I did not touch [Doe 2] in any sexual way."

After trial, in his pro per "motion to discharge retained counsel" on September 16, 2016, Shumate attached an affidavit of an expert he had retained that month to review the covert call recordings. According to Shumate's expert, "Many of the statements [on the transcript] were in fact the OPPOSITE of what was actually said. [¶] For Example: The assumed confession when asked 'did you lick her vagina?' the

24

transcript answer is recorded as 'yeah' but the response on the recording which is really quiet says 'no . . . I didn't.' This statement is immediately followed by another assumed confession recorded on the transcript as 'vagina, and god yes I'm sorry.' Once enhanced you can hear what is being said is '. . . down to kiss and it was over.'" The expert also alluded to "several more inaccuracies . . ." between the transcript and the recordings.

Shumate also reviewed the transcripts himself after trial and contended that in his exchange with mother, the "prosecution deleted his partially inaudible answer (again denying the allegation) and then replaced it with vagina. And [with] god yes I'm sorry." Shumate alleged that these and other words were "added to create harmful and off color remarks which I did not make." He asserts in his brief on appeal that "the prosecutors and police had 'limitless access to any word or phrase [he] may have spoken to anyone [among] the members of his defense team," which they used to falsify not only the transcripts, but also the "audio tapes admitted at trial."

Now on appeal, Shumate contends that the trial court erred in allowing mother to authenticate the transcripts. He asserts, "The erroneous authentication of the transcripts caused the jury to overemphasize the value of the transcript so that the transcript, not the tape, became the evidence." Shumate faults the trial court for "apparently never listen[ing] to the tape recording to compare the tape to the transcript prepared and submitted by the prosecution" and because the court "never directed the parties to meet and agree on those portions of the transcript which should be deleted or replaced with asterisks or the word 'inaudible' or 'unintelligible.'" He also contends the court erred in "not recommend[ing] that trial counsel prepare a transcript representing Shumate's version of the tape recording."

We observe that well before trial, when the parties and the court were discussing discovery in June 2015, the court asked defense counsel if he planned to have the calls transcribed, and counsel did not answer affirmatively, stating only that Shumate's voice was difficult to hear. At the next hearing a few weeks later, the

25

prosecutor indicated that her technology department had informed her the recordings could be enhanced for better sound quality and provided to the defense. When the court inquired whether "you're okay with that process," defense counsel responded, "Yes."

On direct appeal, we review claims of error in a trial court's evidentiary rulings based on the circumstances before the court when it made the ruling, including whether an objection was made and the grounds for the objection. Specifically, we "'review the correctness of the trial's ruling at the time it was made . . . and not by reference to evidence produced at a later date." (*People v. Robertson* (2012) 208 Cal.App.4th 965, 991.) To preserve a claim of error, the party must have objected below and "ma[d]e clear the specific ground of the objection." (Evid. Code, § 353, subd. (a).) "'The reason for the requirement is manifest: a specifically grounded objection to a defined body of evidence serves to prevent error. It allows the trial judge to consider excluding the evidence or limiting its admission to avoid possible prejudice. It also allows the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal.' [Citation.]" (*People v. Partida* (2005) 37 Cal.4th 428, 434 (*Partida*).)

These rules govern our review here, where Shumate does not raise a claim of ineffective assistance of trial counsel regarding preparation of the transcripts. Therefore, we review only his specific objection to the transcripts at trial, which was limited to their admission as exhibits. He did not challenge what he now characterizes as mother's "authentication" of the transcripts. That claim is therefore forfeited. (*Partida*, *supra*, 37 Cal.4th at p. 435.)

As the trial wound down and the parties and the court addressed moving exhibits into evidence, defense counsel objected to admission of the transcripts. Counsel stated, "I think the transcripts shouldn't be admitted into evidence, but the audio CD, I don't have any objection to those." The court noted "that doesn't mean they [the jurors] can't use them as an aid to recollection, as I admonished them. Every time I told them,

26

when we had a transcript, they can have them as an aid to listening to the DVD.  The DVD is evidence and controls.  If there's a conflict between the two, the DVD prevails. They may keep a copy of [the transcript], make notes on it, use it for clarification as an aid to recollection."

Observing that "if you're going to produce any audio, you're required to produce a transcript," the prosecutor argued that, having "written notes on it" and being "allowed to take it back there" to the jury room, "I don't see . . . a functional difference between having it marked as an exhibit and calling it an exhibit versus having it back there as an aid."

The trial court concluded "the transcripts will be allowed in," admitted them as exhibits, and noted that in addition to its previous admonishments concerning use of the transcripts during trial, it would instruct the jury further on their use, including omissions.  The court instructed the jury:  "The transcripts of the CD/audio that you have in your binders were received into evidence as exhibits.  Sections of a transcript may have been deleted.  Disregard any deleted sections and do not try to guess what they might have been."  The court also instructed the jury, "The transcripts are an aid to assist you in listening to the CD/audio.  The CD/audio is evidence and controls.  If there's a conflict between the CD/audio and transcript, the CD/audio prevails."

We review a trial court's evidentiary rulings for abuse of discretion. (*People v. Cowan* (2010) 50 Cal.4th 401, 462.)  This includes admission of a transcript of a tape recording.  (*People v. Polk* (1996) 47 Cal.App.4th 944, 953, 956 (*Polk*).)  The rules of court require that a party must provide a transcript of any recording played at trial. (Cal. Rules of Court, rule 2.1040(a)(1); *San Francisco Tomorrow v. City and County of San Francisco* (2014) 229 Cal.App.4th 498, 532 & fn. 32.)

"'[T]ranscripts of admissible tape recordings are only prejudicial if it is shown they are so inaccurate that the jury might be misled into convicting an innocent man.'"  (*Polk*, *supra*, 47 Cal.App.4th at p. 955.)  Shumate has not done so here, where

that was not the basis of his objection below.  As in *Polk*, the trial court here did not restrict the defense from "prepar[ing] a transcript representing its version of the tape" recording.  (*Id.* at p. 955.)  There, the defense "submitted its version of the tape recording," which enabled the court to direct the parties "to meet and agree on those portions of the transcript which should be deleted or replaced with asterisks or the word 'inaudible' or 'unintelligible.'"  (*Ibid.*)  It also enabled the jury "to compare the different versions while listening to the tape."  (*Ibid.*)

Here, the record reflects that the court, the attorneys, and the jurors followed along in the transcripts as the recordings were played at trial, and none raised any concern that the transcripts were inaccurate. (See *Polk*, *supra*, 47 Cal.App.4th at p. 955.)  This raises a strong inference that the transcripts accurately reflected the tapes as played in court.  As in *Polk*, the trial court admonished the jury that "the transcript was only to be used as an aid in determining what was actually said on the tape" (*id.* at p. 952), and the court here instructed the jury that the tape controlled if there was any doubt.  Additionally, as was the case in *People v. Jones* (2017) 3 Cal.5th 583, Shumate did not "request any specific changes to the transcript."  (*Id.* at p. 611.)  Instead, he adopted it and the recording played in court as being correct, and attempted to explain the incriminating portions.  In these circumstances, we find no abuse of discretion in the trial court's admission of the transcripts.

5.    *Fresh Complaint Doctrine*

Shumate contends the trial court erred in admitting evidence of Does 1 and 2's reports of abuse under the fresh complaint doctrine.  Each disclosed Shumate's abuse to a third party, who then testified about the report at trial.  For Doe 2, the third party was her mother.  Shumate did not object to testimony by Doe 2's mother relaying Doe 2's disclosure, thereby forfeiting his fresh complaint challenge on appeal.  (Evid. Code, § 353.)  We find no error in the trial court's ruling admitting Doe 1's disclosure to

28

attorney McGuire under the fresh complaint doctrine. The abuse of discretion standard applies (*People v. Alvarez* (1996) 14 Cal.4th 155, 203); there was none here.

Under the fresh complaint doctrine, "proof of an extrajudicial complaint, made by the victim of a sexual offense, disclosing the alleged assault, may be admissible for a limited, nonhearsay purpose—namely, to establish the fact of, and the circumstances surrounding, the victim's disclosure of the assault to others—whenever the fact that the disclosure was made and the circumstances under which it was made are relevant to the trier of fact's determination as to whether the offense occurred." (*People v. Brown* (1994) 8 Cal.4th 746, 749-750 (*Brown*).) The evidence is admissible only "for the limited purpose of showing that a complaint was made by the victim, and not for the truth of the matter stated. [Citation.] Evidence admitted pursuant to this doctrine may be considered by the trier of fact for the purpose of corroborating the victim's testimony, but not to prove the occurrence of the crime." (*People v. Ramirez* (2006) 143 Cal.App.4th 1512, 1522.)

The Supreme Court "caution[ed]" in *Brown* that "if the details of the victim's extrajudicial complaint are admitted into evidence, even with a proper limiting instruction, a jury may well find it difficult not to view these details as tending to prove the truth of the underlying charge of sexual assault." (*Brown*, *supra*, 8 Cal.4th at p. 763.) Shumate contends that is what occurred here. We disagree.

Attorney McGuire testified that Doe 1 told him Shumate digitally penetrated her when she was six years old at her church, and there was an incident in a car that included oral copulation and digital penetration when she was 12 years old.

The *nature* of the alleged sexual conduct may be disclosed under the doctrine. Thus, complaints to a third party that the defendant touched the child "'in my weenie'" in a public restroom (*People v. Daily* (1996) 49 Cal.App.4th 543, 548, 552) or "'pulled her pants down and . . . kissed her between the legs'" (*People v. Cordray* (1963) 221 Cal.App.2d 589, 594) are admissible. The same is true for the fresh complaint here.

29

6. *Pitchess Motion*

Shumate requests that we review for discoverable information, if any, the record of the sealed proceedings the trial court conducted pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*). The Attorney General agrees our review is appropriate.

Shumate sought *Pitchess* review in the trial court of a jail sergeant's personnel files, correctly anticipating that the sergeant would testify in rebuttal. The sergeant testified that before trial Shumate threatened publication of a Web site critical of the sheriff's department, in particular the Orange County jail facilities, unless "you guys" prevented Doe 1 from "show[ing] up to court on Monday." According to the sergeant, Shumate explained that if Doe 1 did not testify, he would win his case.

In conducting its in camera *Pitchess* review, the trial court swore in the custodian of records in charge of the sergeant's personnel and other files, including those reporting grievances, if any. The court questioned the custodian about the procedures in which complaints make their way into the file or database, including inmate complaints, and then the court reviewed the files. The court described the contents of the files, including total number of pages and categories of documents within each, and found "no discoverable materials."

We review a trial court's decision on a *Pitchess* motion for an abuse of discretion. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1228 (*Mooc*).) After independently reviewing the sealed record of the in camera proceeding, we find nothing suggesting an abuse of discretion in failing to order disclosure of any documents. (*Mooc*, at p. 1232.) The *Pitchess* proceedings therefore furnish no basis to reverse Shumate's conviction.

7. *Cruel and/or Unusual Punishment*

Shumate argues he does not deserve a sentence of 45 years to life "for touching the two girls three times." According to Shumate, his sentence constitutes cruel and unusual punishment violating the Eighth Amendment to the United States

30

Constitution, and it similarly violates the cruel or unusual punishment clause of article I, section 17 of the California Constitution.  Both clauses "prohibit punishment that is 'grossly disproportionate' to the crime or the individual culpability of the defendant." (*People v. Mendez* (2010) 188 Cal.App.4th 47, 64.)

"Outside the death penalty context, "'successful challenges to the proportionality of particular sentences have been exceedingly rare.'"  [Citations.]" (*People v. Reyes* (2016) 246 Cal.App.4th 62, 83 (*Reyes*).)  Such findings "occur[] with exquisite rarity" (*People v. Weddle* (1991) 1 Cal.App.4th 1190, 1196) because "in our tripartite system of government it is the function of the legislative branch to define crimes and prescribe punishments."  (*In re Lynch* (1972) 8 Cal.3d 410, 414.)  Consequently, the defendant must overcome a "considerable burden" to override the sentence.  (*People v. Bestelmeyer* (1985) 166 Cal.App.3d 520, 529.)  It must be clearly, positively, and unmistakably unconstitutional.  (*People v. Rhodes* (2005) 126 Cal.App.4th 1374, 1390.) Shumate does not meet that burden here.

Arguing his sentence is too harsh compared to those meted out for other crimes, he points to a sentence length of 5 to 25 years in New York for two or more acts of sexual misconduct with a child over a period of more than three months (N.Y. Pen. Code, §§ 70.02, 130.75(1)(A)), and up to 16 years for repetitive sexual abuse of a minor residing with the offender in California (§ 288.5).  He also suggests his crimes cannot be compared to killing a victim, yet he received almost double the term of 25 years to life for first degree murder.  (§ 187.)  He similarly cites other crimes of force, "none of which garners a life sentence," including rape (§ 264), willful infliction of corporal injury on a child (§ 273d, subd. (a)), forcible lewd conduct with a child under 14 years of age (§ 288, subd. (b)), and statutory rape of a child under age 16 (§ 261.5, subd. (d)).

We disagree with Shumate's analysis.  First, we observe that the New York sentence of up to 25 years is longer than if he had limited his crimes here to one victim. (See § 288, subd. (a) [terms of up to 8 years for each offense].)  Second, the sentences he

31

references for individual offenses are not relevant because "[t]he penalty for a single offense cannot be properly compared to the penalty for multiple offenses." (*People v. Estrada* (1997) 57 Cal.App.4th 1270, 1282.) Third, Shumate's victims were very young. "It is well within the prerogative of the Legislature to determine that sex offenses against young children are deserving of longer sentences than sex offense against adults or nonsex offenses." (*People v. Gomez* (2018) 30 Cal.App.5th 493, 502.)

Shumate committed sex offenses against multiple children, "society's most vulnerable victim[s]." (*Reyes*, *supra*, 246 Cal.App.4th at p. 85.) Offenses against multiple victims triggers the Legislature's justifiable concern for sex offender recidivism. (See § 667.61, subd. (e)(4); see, e.g., *People v. Wutzke* (2002) 28 Cal.4th 923, 929-930.) "California has recognized, and reasonably so, that sex offenders present a serious danger to society because of their tendency to repeat their sexual offenses. Sexual offenses not only invade the deepest privacies of a human being, and thereby may cause permanent emotional scarring, but they frequently result in serious physical harm to, or death of, the victim." (*People v. Meeks* (2004) 123 Cal.App.4th 695, 709.)

In particular, a defendant who has reoffended over a lengthy period against multiple victims presents heightened risks and greater culpability. An insignificant or nonexistent prior criminal record may weigh in the defendant's favor, as it does for Shumate, but "three separate sexual offenses . . . and abuse of trust against a vulnerable victim do not." (*People v. Baker* (2018) 20 Cal.App.5th 711, 723.) Shumate had significant time to reflect during the six or seven years between his lewd assaults on Doe 1, and additional time before he abused Doe 2. In both instances, he had a close, family-like relation with the victims, and he violated their trust. Incapacitation to prevent a perpetrator from reoffending, retribution, and deterrence are all valid penological goals that apply here, along with rehabilitation where there is the opportunity for parole. (*In re Nunez* (2009) 173 Cal.App.4th 709, 730.)

Weighed against these considerations, we cannot say Shumate's punishment was disproportional to his offenses.

## DISPOSITION

The judgment is affirmed.


GOETHALS, J.

WE CONCUR:


MOORE, ACTING P. J.


IKOLA, J.